The American Dock and Improvement Company, and the Central Railroad Company of New Jersey, complainants and appellants,

*v.*

The Trustees for the Support of the Public Schools, the Executors of Asa Packer, deceased, et al., defendants and respondents.

In 1872 the legislature authorized the riparian commissioners, governor and attorney-general to make a deed in the name and under the great seal of the state, to the New Jersey West Line Railroad Company, for any lands of the

state under tide water, or that theretofore had been under tide water, which should happen to come within the location of the route or of the stations, depots or other works of the company or be needed therefor—the boundaries and price to be fixed by the riparian commissioners—the consideration to be paid to the trustees of the school fund. A deed was made accordingly, on the 19th of March, 1872. For part of the consideration ($82,000) the trustees for the support of the public schools accepted a bond with Asa Packer as surety, secured by mortgage on the premises, as an investment for the benefit of the school fund. The Central Railroad Company was in possession, and had put improvements on part of the premises granted. On the 12th of November, 1874, the riparian commissioners, for $300,000, made a grant to the Central Railroad Company of several tracts of land under water, excepting thereout the premises and privileges granted to the West Line company, with a covenant that in case the state had not power to vest title in the West Line company, the state should, for the consideration of $1, release to the Central Railroad Company the premises granted to the West Line company, free from any encumbrance thereon, by mortgage given to the state. The trustees foreclosed their mortgage, and took a final decree October 22d, 1875. The complainants were not parties to the foreclosure suit. On March 1st, 1879, complainants filed a bill against the West Line company, under the act to quiet titles. *Rev. 1189.* The mortgagees and other encumbrancers and Asa Packer were made defendants in this bill. The bill prayed, among other things, that the trustees be restrained from selling the mortgaged premises under their decree. On appeal from an order of the chancellor denying an injunction to stay a sale under the execution, on the foreclosure decree, pending the suit—*Held,*

1. That the trustees for the support of public schools are the custodians of the fund set apart for the support of public schools, free by constitutional provision from even the control of the legislature, except in the designation of the mode in which the interest and dividends arising therefrom shall be applied for the support of public schools. For the purposes of the administration of the fund of which they are made custodians and of the rights and remedies upon or against the securities in which it is invested, the trustees are constituted the representatives of the state.

2. Suits brought by the trustees for the foreclosure of mortgages—investments of the school fund—are subject to the same defences by answer or cross-bill as like suits by other mortgagees; and, as mortgagees, they may be made parties to a bill to quiet the title filed against the mortgagor.

3. The covenant contained in the grant of the riparian commissioners to the Central Railroad Company, is executory in terms and legal effect, and can only be executed by a bill for specific performance. To such a bill the state is a necessary party, and the trustees are not its representatives in such a litigation.

4. The riparian commissioners had no power, by the covenant contained in the grant to the Central Railroad Company in 1874, to release and discharge

a mortgage which before that time was an investment of part of the school fund.

5. A mortgagor who mortgages an embarassed title, or whose title has subsequently become clouded, cannot, in the absence of fraud, have the foreclosure proceedings stayed on account of an apprehension that the mortgaged premises will not bring full value at a foreclosure sale. His remedy is by redemption.

6. A court of equity will ordinarily not interfere to enjoin a sale of lands under an execution against one person, the title to which is claimed by another, for the reason that such a sale will not prejudice the rights of the latter. To warrant resort to the restraining power of the court, the case must present some recognized ground for equitable relief—fraud or irreparable injury.

7. Courts interfere with great reluctance with the collection of the public revenues. To justify resort to a court of equity to stay the collection of public revenues, the party must make a case strictly within the bounds of equity jurisdiction—an injury otherwise not remediable; and he must seek and prosecute his remedy with promptitude.

8. The equity of a party who relies on an equitable estoppel to give validity to an inefficient contract is not to have his contract made binding, but to put his adversary to an election between performance of the contract and repudiation of it on equitable terms.

9. The doctrine of equitable estoppel presupposes that the person against whom it is set up has the volition to accept or reject the proffered benefit and power to restore the consideration if received.

10. The trustees for the support of public schools have no control over the state's lands under water; no authority to decide what lands under water shall or shall not be sold; or to fix the price or dictate the terms and conditions on which sales shall be made, nor power to rescind contracts of sale made by the riparian commissioners, which they may deem prejudicial to the school fund. They have not even the capacity to determine from what sources the revenues for the support of public schools shall be derived; no choice as to what money shall or shall not become part of the school fund. Their powers and duties in relation to the school fund are purely executive and ministerial—to invest the fund and appropriate its income annually to the support of public schools.

11. The trustees are not equitably estopped from collecting their mortgage by the covenant which the riparian commissioners inserted in their grant to the Central Railroad Company, although the state received for the lands granted thereby the sum of $300,000, which, by the act to increase the school fund of the state (*Rev. p. 1061 § 67*), went into and became part of the school fund.

12. The prayer of the executors of the surety (who have no indemnity for the liability of the surety's estate on the bond except the vendible value of

the mortgaged premises and the obligation of a bankrupt corporation), that the mortgaged premises be sold, also presents considerations of pre-eminent weight on an application to a court of equity for a discretionary writ, which is never allowed except on a clear preponderance of equity on the side of the applicant.

13. The receiver of the West Line company, the mortgagor, by his answer to the bill in this case, affirms the validity of the title of the West Line company, but charges that it would be inequitable to dispose of the title by foreclosure, or otherwise, until its validity as against the complainants' title is determined, and asks, also, that the sale be delayed until it can be made upon an unclouded title. The executors of the surety pray a sale for the purpose of discharging his liability on the bond. A sale of the mortgaged premises at this time will satisfy the mortgage debt.—*Held*, that, under the circumstances, the covenant contained in the grant to the Central Railroad Company would create an equity in the complainants to be allowed to redeem the trustees' mortgage and be subrogated to the right of the mortgagees in the decree so far as to give protection against a sale under it, pending the litigation of the titles of the parties respectively, subject, however, to the equities of the personal representatives of the surety on the bond; but that it could not be made available to the complainants against the indisputable equity of the mortgagees, and of the personal representatives of the surety on the bond, to have the mortgage and the liability of the surety taken out of this litigation and disposed of in the condition of affairs as they were when the mortgage was given and the obligation of the surety was incurred.

———

On appeal from a decree of the chancellor, whose opinion is reported in *American Dock Co.* v. *Trustees of Public Schools, 5 Stew. Eq. 428.*

*Mr. F. T. Frelinghuysen,* for appellants.

PART I.

The chancellor declines to enjoin the trustees for the support of public schools, on the ground that they are agents of the state, and, as such, have an immunity from being sued.

It is undoubtedly true, as claimed, that the state, as an essential attribute of its sovereignty, enjoys an immunity from being sued in its own courts, without its consent. *Loder* v. *Baker, 10 Vr. 50.*

I. That position does not sustain the chancellor's order.

The state is not a party to this suit, and a state never is a party unless it appears on the record as such. It is not sufficient to oust jurisdiction that the state may have an interest in the cause, or that the parties before the court are sued for acts done as agents of the state. *Osborn* v. *U. S. Bank, 9 Wheat. 852, 853 ; Story on Const. § 1685.*

The point arose in an early state of the government, in a suit between private persons, where one party asserted the land in controversy to be in Connecticut and the other in New York, and the court held that neither state could be considered as a party. *Fowler* v. *Lindsey, 3 Dall. 411 ; State of New York* v. *State of Connecticut, 4 Dall. 1, 3, 6 ; United States* v. *Peters, 5 Cranch 115, 139 ; 1 Kent's Com. 302 § 15.*

Neither is there anything in the cases cited by the chancellor that conflicts with the foregoing positions. I will refer to each of them.

1. He cites *Michigan State Bank* v. *Hastings, 1 Walk. Ch. 9.*

This case was overruled by the supreme court in the case of *Michigan State Bank* v. *Hammond, 1 Doug. 527*, and *Same* v. *Hastings, Id. 225*. In this last case it was held that although a state could not be sued in its own courts, yet that the rule applies only where the state is made a party defendant to the record.

2. *United States* v. *McLemore, 4 How. 286.*

The court (McLean, J.) says : " There was no jurisdiction of this case in the circuit court, as the government is not liable to be sued, except with its own consent, given by law. Nor can a decree or judgment be entered against the government for costs."

3. *Hill* v. *United States, 9 How. 388.*

The point decided in this case is, that a bill in equity to enjoin the United States cannot be entertained.

4. *Beers* v. *Arkansas, 20 How. 529.*

The state of Arkansas, through its legislature, authorized the state to be sued. After a suit had been commenced and was pending against it, an act was passed imposing certain restrictions, viz., requiring the filing of bonds by the plaintiff, or dismissal of the suit.—*Held,* that the authorization of a suit against

a state was not a contract, and that the suit pending was subject to the act afterwards passed.

5. *State* v. *Kirby, 2 South. 835,* and *Loder* v. *Baker, 10 Vr. 49.*

These cases merely decide that the state, as such, cannot be sued without its consent.

6. *Priddy* v. *Rose, 3 Meriv. 84.*

This suit was against government officers, the treasury of the navy, and the attorney-general, for the recovery of moneys due from the government.

The court (Sir William Grant, M. R.) says: "Here the officer is commanded by the government to withhold the money. * * * Then the question is between the government and Mr. Hurst, or Mr. Hurst's assignee, and it is not, I apprehend, in this court that such a question can be decided." That was not the court, as another was provided. Although no court is provided in New Jersey to establish claims against the state, we may admit that the trustees for the support of public schools could not be sued for money or on account of a duty due from the state. All we claim is, that they may be restrained, even if the state is interested, from using their office to violate private right.

7. *Nurse* v. *Lord Seymour, 15 Beav. 254.*

This case was upon a demurrer to a bill for specific performance and for compensation &c., filed by the plaintiff against the commissioners of woods and forests.

The commissioners (as was held) were not (under *7 Geo. IV. c. 77*) entitled to sue or liable to be sued for the specific performance of contracts entered into with and by them.

The court (Lord Langdale, M. R.) says: "It is truly said that if these commissioners are liable to sue, and to be sued, such liability must rest alone upon grounds and reasons distinctly stated in the statute, for their powers are entirely statutory, and nothing else."

There is no question in this case of the right of the trustees &c., to sue, and should be no question that they are liable to be

restrained from improperly using the process of the court ; and see the case of *Rankin* v. *Huskisson, 14 Sim. 13.*

8. *Trustees for the Support of Public Schools* v. *City of Trenton, 3 Stew. Eq. 669,* which, in giving construction to the tax laws, decides that the school fund is the property of the state, and not subject to be taxed, because such taxation would necessarily involve other taxation to pay the taxes.

9. *State* v. *Trenton, 11 Vr. 91,* is to the same effect as last case.

I have thus noticed every case the chancellor refers to, and find no intimation there or elsewhere that parties suing cannot, because they are agents of the state, be restrained from improperly using the process of the court.

But if the fact that the state has an immunity from suits does not oust the court of jurisdiction, the chancellor intimates that the suit should not be maintained, because the state is not a party.

II. There is no necessity that the state should be made a party to the suit, had that been possible. In 1874, the riparian commissioners asserting, and the Central Railroad Company denying, the validity of the grant to the West Line Railroad Company, the said commissioners, for a full consideration, agreed that if the state had not the right and power to make the grant, that the state, for one dollar, would release the premises described in the grant, free of encumbrance, to the Central Railroad Company of New Jersey. But there is not a word in the bill or in its prayer that seeks a decree that the state shall execute such release. If there were it would have been proper or essential that the state, were that possible, should be made a party, but such is not, in any sense, the object or prayer of the bill.

III. The trustees &c. are a public corporation with a limited power of bringing suits, and subject as to those suits, as other suitors are, to be defended against, either by the persons they bring into court, or by those having a property interest in the subject matter of the suit. The defence may be by answer or

cross-bill, or by invoking the restraining power of the court they have selected.

Within the compass of its functions for contracting, taking, purchasing, holding, lending, managing and selling and conveying school property, it has all the powers and liabilities of a corporation; all the common law incidents of a corporation inhere in this body, within the range and in its execution of the purposes of its corporation. *Levy Court* v. *Coroner, 2 Wall. 501.*

As to the liability to be sued being an inseparable common law incident to every corporation, see *Kyd. on Corp. 69; 2 Kent 278; 1 Black 475; Ang. & Ames on Corp. 110.*

County commissioners in Pennsylvania are *quasi* corporations, and capable of being sued. *Van Kirk* v. *Clark, 6 Serg. & R. 286.*

The governor of a state is a *quasi* corporation *sole,* and bonds payable to him may be sued in his name. *Governor* v. *Allen, 8 Humph. 176.*

Nor does the fact that the state alone is interested in the corporation clothe it with the immunities of sovereignty, or exempt it from the jurisdiction of the state courts. *State Bk. So. Car.* v. *Gibbs, 3 McCord 377.*

The suit of *Young* v. *Trustees for the Support of Public Schools, 4 Stew. Eq. 290,* being an appeal from the decree below, is as much a suit as is this bill to restrain the enforcement of the decree filed by one who could not appeal.

IV. I will now notice some other positions taken by the chancellor.

1. As to the statement of the chancellor, that "the trustees are not empowered to defend their title to the mortgage," that "they have no funds with which to carry on litigation, and no authority to spend the money in their hands for such purposes," we reply, that if they have no authority to defend their title to the mortgage, the result must be that they must not attempt to enforce their title to it, not that their mere assertion of title against the citizen by suit is to have the effect of an irreversible decree.

2. The chancellor having decided that this suit is well brought to quiet the title of the complainants, then states that it would be superfluous for him to consider the question of title, because the state or its agents are not liable to be sued.

Now, if the chancellor holds that he has not jurisdiction of the case, his judicial control over it there terminates, and the decision of the jurisdictional question should not be prejudiced by any extra-judicial expressions as to the merits of the complainants' application.

3. The chancellor still further, after deciding that he has no jurisdiction over the case, expresses the opinion that a sale will not injure the complainants, because the purchaser will have no more title than the mortgagor, the West Line Railroad Company, had.

Is it no injury to the complainants, in their credit, peace and prospective arrangements, to have the property on which they have spent hundreds of thousands, and in relation to which they have spent millions, sold at public sale, and that, too, by the state, and under a title which it is claimed is the state's title?

Is it no damage to the holders of the $3,000,000 of bonds given by the dock company, and secured by a mortgage on these and adjoining lands, that the mortgaged premises are thus sold?

It seems, therefore, to follow as a necessary consequence, that if the aid of equity may be invoked to remove a cloud upon title to realty, it may, with equal propriety, be exerted to enjoin such illegal acts as will necessarily result in a clouded title. *High on Inj.* § *269 ; Pettit* v. *Shepherd, 5 Paige 493 ; Christie* v. *Hale, 46 Ill. 117 ; Oakley* v. *Trustees &c., 6 Paige 262.*

And it may be asserted as a general proposition, that a sale of lands under execution, which would confer no title upon the purchaser, and whose only effect would be to cloud the title of others, will be enjoined. *Bank of U. S.* v. *Schultz, 2 Ohio 471 ; Norton* v. *Beaver, 5 Ohio 178 ; Christie* v. *Hale, 46 Ill. 117 ; Pixley* v. *Huggins, 15 Cal. 127.*

In *Key* v. *Munsell, 19 Iowa 305,* it is held that it is not necessary that the sale should divest the complainant of his title to warrant equity interfering ; it is sufficient that it simply operates to cloud his title. *Herman on Ex. 610 ; Freeman on Ex.* § *438.* See, also, *Holmes* v. *Chester, 11 C. E. Gr. 79.*

4. But further, the injury done by a sale in this case would be marked and peculiar. The receiver of the Central Railroad Company asks that the sale be restrained, and the receiver of the West Line company, while insisting on the validity of the grant, claims that, to sell the property before the title is settled, will injure his company, as the property, under such circumstances, will not realize more than the amount of the mortgage.

5. The chancellor again, after deciding that he has no jurisdiction, adjudges that the state claims that the state had good title to make the grant, and that the complainants have no title, and that the weight of authority is, that in the absence of fraud and irremediable injury, courts of equity will not restrain judicial sales.

*Mills on Em. Dom.* § *46,* says : " To take property already appropriated to another public use, the act of the legislature must show the intent to do so, by clear and express terms, or by necessary implication, leaving no doubt or uncertainty respecting the intent."

A general authority to lay out a railroad does not authorize a location over land already devoted to another railroad or a public use (the act must be distinct on that point), unless the route specified necessarily crossed another railroad, turnpike or canal, where the right to cross would arise by necessary implication. *State* v. *E. & A. R. R. Co., 7 Vr. 181 ; N. J. S. R. R. Co.* v. *Long Branch Comrs., 10 Vr. 28 ; M. & E. R. R. Co.* v. *C. R. R. Co., 2 Vr. 205 ; Housatonic R. R. Co.* v. *Lee & Hud. R. R. Co., 118 Mass. 391.*

6. The chancellor further refers to *High on Inj.* § *273,* to show that a sale will not be enjoined " when, under the peculiar judicial system of the state, ample remedy may be had at law." The peculiar system of New Jersey is, that the remedy is in equity, and under an act passed March 2d, 1870, entitled " An

act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same." *Rev. p. 1189.*

The chancellor decides that he has ascertained from an examination of this case, that the state is interested in the suit. Chief-Justice Marshall, in *Osborn* v. *U. S. Bank, 9 Wheat. 853,* says : " It would be a curious anomaly for the court to examine and decide on a state's interest without having a right to exercise any jurisdiction in the cause." But waiving that, how did the chancellor ascertain that the state was interested in the case ?

It would be well nigh a farce for this highest court of New Jersey to decide that this immunity from suit by citizens of New Jersey extended to a respectable, but by no means sovereign, citizen of Pennsylvania.

## Part II.

I. Assuming, for the present, that the grant made by the riparian commissioners was authorized by the act of the legislature, the appellants (who were the complainants below) insist that the mortgage in question, given by the New Jersey West Line Railroad Company, is invalid, because on premises which are the property of the complainants by reclamation ; and under this head we will show—

1. The premises in question consist of a tract in Communipaw Cove, within the riparian commissioners' exterior line of filling, containing fifty-eight and thirty-six hundredths acres.

2. We submit that the Central Railroad Company had the corporate power to become the owner of the *ripa* on which the premises rest.

" Corporations have incidentally, at common law, the right to take, hold and transmit real or personal property to an unlimited extent." *Ang. & Ames on Corp.* § *145,* and cases there cited ; *McCartee* v. *Orphan Asylum, 9 Cow. 437, 508 ; Leazure* v. *Hillegas, 7 Serg. & R. 319 ; Runyon* v. *Foster, 16 Pet. (U. S.) 128 ; Rainey* v. *Laing, 58 Barb. 453, 489.*

This distinction between restricted capacity to purchase and restricted capacity to hold, has been carried so far that the court has enforced specific performance of a contract to convey land to

a corporation which had no capacity to hold it.  *Banks* v. *Poitiany, 3 Rand. 136.*

3. We submit that being thus empowered, the Central Railroad Company did become the owner of the *ripa* on the cove.

4. The American Dock and Improvement Company had the right to acquire, and did acquire, the premises in question from the Central Railroad Company.

5. We will now consider the extent and character of the reclamation.

6. Now what, under the unquestioned law of the state, are the property and property rights which this reclamation confers on the complainants? All the New Jersey authorities agree (*Gough* v. *Bell, 2 Zab. 462; S. C., 3 Zab. 624*) that when, in the language of *Stevens* v. *Railroad, 5 Vr. 548,* the riparian owner has taken possession of the land under water in front of him, the license which was before revocable becomes irrevocable—that is, becomes a vested right. *Keyport Case, 3 C. E. Gr. 516.*

II. While the law incident to riparian owners generally is that a riparian owner has a revocable license to reclaim in front of his *ripa,* and to have access to such reclamation when made, such revocable license becoming irrevocable on the reclamation being made, we submit that when the Central Railroad Company became the owner of the *ripa* around the cove, it had, by virtue of the provisions of its charter, a vested and irrevocable license to make reclamation and to have access thereto, and if so, this vested right was property, and, of course, passed by the conveyance of 1866 to the American Dock Company, and is property which neither the grant nor mortgage can lawfully invade or becloud.

III. The American Dock and Improvement Company is not only invested with the title of the Central Railroad Company to the *locus in quo,* but, in addition thereto, has title by virtue of an independent grant made to it by the state, for which the state has received or reserved a full consideration.

IV. The state, by its acquiescence in the possession of the *locus in quo* by the complainants claiming title, and by its acquiescence in the large and continuous expenditure made thereon and in relation thereto by the complainants while devoting the premises to a public work, is estopped from denying the complainants' right of possession.

We submit that this acquiescence gives the construction to the charters of the Central Railroad Company and to the charter of the dock company, which those companies claim.

Contemporaneous exposition is of two sorts. First, what was done by the people at the time the law was made. Second, what was done by the authorities of the state under the law. *Smith on Stat. Const. 438.*

The acquiescence of New Jersey in the expenditures of the central and dock companies is more than an exposition of their charters. *Stevens* v. *Railroad Company, 5 Vr. 532,* declares that by a local custom the shore-owner has a license to reclaim the land between high and low water marks, but that the legislature may revoke this license. The acquiescence renders the license irrevocable. I cite but one of many authorities—*Trenton Water Power Company* v. *Chambers, 1 Stock. 471*—which holds that where one has permitted another to change the character of the property, and expend large sums of money upon it, he cannot recover the possession by even paying for the improvements; the only relief the court will afford is compensation for his land.

V. The dock company, as the owner of the *ripa* on which the alleged grant to the West Line Railroad Company rests, had, on March 19th, 1872, when the riparian commissioners made the grant, the right of pre-emption—which the commissioners' grant violates, and is, therefore, invalid and void, as is the mortgage given thereon.

The riparian act of 1869 and the act of 1872, are *in pari materia,* and are to be read together.

The rule is, that when one statute was undoubtedly under the consideration of the legislature when passing another, the former

ought to be taken into consideration in construing the latter statute. *Bacon's Abr. Statutes, vol. IV., p. 646; Thayer* v. *Dudley, 3 Mass. 296; Holbrook* v. *Holbrook, 1 Pick. 248, 254.*

On the subject of *pari materia,* see *Smith on Stat. Const.* § *636; Sedgwick (2d ed.) 209 et seq.* and notes.

In *The Sloop Elizabeth, 1 Paine C. C. 11,* the court lays down the position that, however broad some of the expressions of a statute may be, yet if, on the examination of different statutes *in pari materia,* it shall clearly appear that those broad expressions were intended to be limited by other provisions of other acts upon the same subject, it is not improper to restrain them accordingly.

While it is true that pre-emption, as a privilege, is not abrogated by the act of 1872, we submit that pre-emption is more than a privilege, and is a vested right which cannot be taken away except for public use and upon compensation.

The opinion of the court in *Stevens* v. *Paterson and Newark R. R. Co.,* held that the wharf act of 1851 only conferred a license to reclaim between high and low water, which the state, by repealing the act, could revoke at any time before the license had been executed; but this pre-emption is a very different thing.

In *Yosemite Valley Case, 15 Wall. 77,* and *Lytle* v. *Arkansas, 9 How. 333,* it is held that the mere occupation or improvement of land will not give the settler a vested right against the United States; but when all the preliminaries in pre-emption acts of the United States prescribed for the acquisition of title have been complied with, the pre-emptor has a vested title to the premises of which he cannot be deprived.

Our supreme court, in *State* v. *Carragan, 8 Vr. 264, 268,* says: "When lands on tide water are within the operation of that act (the riparian act of 1869, which repeals, as to New York bay &c., the wharf act of 1851, and gives the pre-emption right), the shore-owner has no right to reclaim, but has the advantage that may accrue from adjacency to the water until such time as the state shall execute its power of disposition, and also the right of pre-emption at a price to be established under the provisions of

the law. These are circumstances that may properly enter into the estimate of valuation."

In *Barnett* v. *Johnson, 2 McCart. 489*, Justice Vredenburgh, in giving the opinion of the court of errors and appeals as to the right Barnett had to adjacency to a canal, says: "A right so essential, so universal in its exercise in all time and among all nations, exists, not as was said in *Gough* v. *Bell*, by a common law local to New Jersey, but by a law common to the whole civilized world."

In *Keyport Steamboat Company* v. *Farmers Transportation Company, 3 C. E. Gr. 516*, Chief-Justice Beasley says: "Public sentiment from the earliest times to this day, and the whole course of legislative action in this state, have recognized a natural equity in the riparian owner to preserve and improve the connection of his property with the navigable waters."

Grants that are beneficial may be presumed to be accepted, and no express acceptance is necessary. *Charles River Bridge* v. *Warren Bridge, 7 Pick. 344, 470, 506 ; 12 Wheat. 70.*

VI. We submit that there is nothing in the act of 1872 that authorizes the West Line Railroad Company to locate on the lands in question, and that it never did there locate; and, of course, the riparian commissioners were not authorized by the act to execute the grant to that company.

The law is, that where authority is claimed to lay a railroad over lands devoted to a public work, it must be so expressly specified in the act. *Mills on Em. Dom.* § *46.*

VII. It is so strenuously insisted that because Francis S. Lathrop joined with John Kean in a bond, that the premises contained in the mortgage should, when sold, bring the amount of the mortgage, and that therefore Mr. Lathrop, the receiver of the Central Railroad Company, is estopped from denying the validity of the mortgage, that a word must be said.

Mr. Lathrop, when he became receiver, found the Central Railroad Company interested in the tract called the West Line grant, in two ways.

The railroad company had a suit pending claiming title to that tract, and he could not, with propriety, suffer it to be sold without an assertion of the company's title, and he filed his petition to have a grossly informal sale set aside.

Mr. Lathrop, as receiver, held $900,000 of the bonds of the West Line Railroad Company, and it was his duty to have it determined to whom the premises contained in this grant belonged, before the premises were sold, so that they would sell at a price to realize considerable on the bonds belonging to the railroad company. If, on determination of this suit, it is held that the *locus in quo* belongs to the complainants, he will, by the suit, have saved a very valuable property for the company. If, on the determination of this suit, it is held that the " *locus in quo* " belongs to the West Line Railroad Company, the property will bring such price as will enable him to realize on the $900,-000 of bonds. In either event it was his duty to institute this suit. And that the school fund should suffer no loss of what was due it, he gives bond that when the sale takes place the fund shall realize its debt and cost.

To say that the bond estops the receiver from saying that the mortgage is invalid, is to say that the bond estops the receiver from doing just that which the bond was given to facilitate his doing, and estops him from doing what is unquestionably his duty to do.

## PART III.

The complainants insist that had no reclamation been made; had the charter of the Central Railroad Company not required it to treat the claims of the riparian owners as property; had the dock company had no grant for the " *locus in quo;* " had there been no acquiescence on the part of the state for years, while they, claiming title, were making large expenditures; had it been true that the state made a grant of the public works of one corporation to another without providing that the former receive compensation—the complainants insist that were all this so, that still by the common law, by that law as adopted in this

Am. Dock and Imp. Co. v. Trustees of Public Schools.

state, by the wharf act of 1851, and by the pre-emption proviso to the eighth section of the riparian act of March 31st, 1869, they have title to the *locus in quo*, have the property right of adjacency and access to the navigable waters of the Hudson, and have the property right of pre-emption, and that the grant invades those property rights, and that therefore it, and the mortgage upon it, are invalid and void.

1. The following is a brief statement of the adjudications in this state affecting the title to lands under the navigable waters of New Jersey : There was a controversy in New Jersey whether the title to the soil under navigable waters was in the East and West Jersey proprietors or in the state. The proprietors, in brief, claimed that the common law assigned the ownership of the sea and arms thereof and the navigable rivers to the king, not only to have jurisdiction thereof, but to have the property therein, and that subjects obtained rights in the soil of the sea by grant from the king ; that Charles the Second, in 1664, conveyed the seas, arms of the sea, and navigable rivers in the territory of New Jersey to his subject, the Duke of York, and that the proprietors hold by several conveyances under that grant.

The state contended that the territory, now New Jersey, and its navigable waters, was held by the king as the representative of the nation, and that Charles the Second transferred the said navigable waters to the Duke of York, governor of the province of New Jersey, as exercising the royal authority, and not for his own use, and that he conveyed the navigable waters to the proprietors, and that they surrendered all governmental rights to the crown ; and that when the revolution took place the people acquired the absolute title to the navigable waters and the soil under them. *Arnold* v. *Mundy, 1 Hal. 1.*

*Waddell* v. *Martin,* in the circuit court of the United States for the district of New Jersey, before Judges Baldwin and Rossell, decided October, 1837. This decision was reversed in 1842, by the supreme court of the United States, in *Martin* v. *Waddell, 16 Pet. 345; Den ex dem. Russell* v. *Associates of the Jersey Company, 15 How. 432; Bell* v. *Gough, 1 Zab. 156,*

*2 Zab. 462, 3 Zab. 624; Stevens* v. *Paterson and Newark R. R. Co., 5 Vr. 532.*

The court will not consider us disrespectful in presenting some reasons why we should not adopt the opinion of a majority of the court in *Stevens* v. *Railroad,* to the effect that the riparian owner has no property rights incident to the *ripa,* either to wharf out, to reclaim, to maintain the benefits of adjacency, but has at best only a revocable license or inchoate right to certain privileges. We have a right to ask the court to consider the questions discussed in that case—because the opinion there expressed is a *dictum* and not an adjudication.

It was an action on the case, brought in the Essex county circuit court. The circuit court rendered judgment for the plaintiff, " for the reason that the act of the legislature set out in the plea does not authorize the acts of the defendants complained of." A writ of error was then brought to remove the judgment to the court of errors and appeals. Of course the question or issue to be determined in the appellate court was the same as that in the court below, viz., whether the defendants' charter authorized them to do the acts complained of. Having easily come to the conclusion that the defendants had not received a grant of authority, of what service was it to inquire if they might have obtained it? If they had not obtained it, though they might, judgment must go against them. If they had not obtained it, and could not, judgment must go against them, all the same. The opinion is one which of course can be reviewed.

The opinion is a *dictum,* that is, " an opinion expressed by a court, but which, not being necessarily involved in the case, lacks the force of an adjudication." *Bouvier.* A judicial opinion is one that is on the question before the court.

We have the further right to ask the court to consider the question discussed in *Stevens* v. *Paterson and Newark R. R. Co.* Because, in and about the year 1863, when the Central Railroad Company, as required to do by the act of 1860, extinguished, by purchase, the claims of the riparian owners around the cove,

those claims were not considered, either by the legislative or judicial departments of the government, as mere revocable licenses, for, being such, they would not have been property which the legislature could have lawfully required the railroad company to respect and purchase. We have the right to consider the question discussed in *Stevens* v. *Paterson and Newark R. R. Co.,* because the complainants, who are trustees for citizens, of what they consider a most valuable property belonging to them, would be derelict if they consented that the state should impair what they seek to show are vested property rights, and thus the state should turn the proceeds of that property into its treasury by merely terming those rights "revocable licenses." For these reasons, the complainants consider it to be not only respectful, but a duty, to insist in the courts of the state that they, as riparian owners, have, incident to their *ripa*, vested property rights, and not a mere revocable license.

2. In England, the riparian owner is considered to have, at common law, property rights incident to the *ripa*. In England, the right of adjacency to navigable water is recognized as property. *Bell* v. *Hull and Selby R. R. Co*, *6 M. & W. 699; Duke of Buccleuch* v. *Metropolitan Board of Works, L. R. (3 Exch.) 306, L. R. (5 Exch.) 221.*

This decision of the court of exchequer chamber was reviewed by the House of Lords in 1872 and reversed. *Lyon* v. *Fishmongers Company, L. R., (1 App. Cas.) 662;* on appeal from the Lords Justices, *L. R., (10 Ch. App.) 674; Cordwainers Company* v. *Kearns, 6 C. B. 388.*

3. Let me now call attention to two authors our courts are in the habit of respecting—Angell and Cooley. *Ang. on Tide Waters (2d ed.) 171, 196, 197.*

Judge Cooley says : " So far as these cases [*Gould* v. *Hudson River R. R. Co., 6 N. Y. 522; Stevens* v. *Paterson and Newark R. R. Co., 5 Vr. 532 ; Tomlin* v. *Dubuque &c. R. R. Co., 32 Iowa 106 ; S. C., 7 Am. Law Reg. 176*] hold it competent to cut off a riparian proprietor from access to the navigable water, they seem to me to justify an appropriation of his property without compensation, for even those courts which hold the fee in the

Am. Dock and Imp. Co. *v.* Trustees of Public Schools.

soil under navigable waters to be in the state, admit valuable riparian rights in the adjacent proprietor.   See *Yates* v. *Milwaukee, 10 Wall. 497; Chicago &c. R. R. Co.* v. *Stein, 75 Ill. 41;* compare *Pa. R. R. Co.* v. *New York &c. R. R. Co., 11 C. E. Gr. 137.*"   *Cooley's Const. Lim. (4th ed.) 680, note; Id. (3d ed.) 544, note 1.*

4. Let me refer to some well-considered cases in the states. *Delaplaine* v. *Chicago and Northwestern R. R. Co., 42 Wis. 214; Lockwood* v. *New York &c. R. R. Co., 37 Conn. 387; Pittsburgh* v. *Scott, 1 Pa. St. 314, 315; East Haven* v. *Hemmingway, 7 Conn. 186; McManus* v. *Carmichael, 3 Iowa 1; Storer* v. *Freeman, 6 Mass. 435; Barker* v. *Bates, 13 Pick. (Mass.) 255; Austin* v. *Carter, 1 Mass. 231; Commonwealth* v. *Charlestown, 1 Pick. (Mass.) 180; Simons* v. *French, 25 Conn. 346; Deering* v. *Long Wharf, 25 Me. 51; Whittaker* v. *Burhaus, 62 Barb. 237; Mather* v. *Chapman, 40 Conn. 382; Goodsell* v. *Lawson, 42 Md. 348; Diedrich* v. *Northwestern &c. R. R. Co., 42 Wis. 248.*

5. Let me call attention to a few cases in the supreme court of the United States.   *Dutton* v. *Strong, 1 Blatch. 23; Yates* v. *Milwaukee, 10 Wall. 497; Weber* v. *Harbor Commissioners, 18 Wall. 51; Martin* v. *Waddell, 16 Pet. 414; New Orleans* v. *United States, 10 Pet. 720; Bowman* v. *Wathen, 2 McLean 376*

6. Let me now call attention to the adjudications of New Jersey.

From the revolution to November, 1870, when *Stevens* v. *Railroad* was before the court, by the common law as adopted in New Jersey, modified to suit the circumstances of the people, and as manifested by expressions of judicial opinion, by public statutes, and by an unbroken custom, the owner of the shore has been recognized as having a right (and not a mere license to be revoked at pleasure) to adjacency to the water.   The best treatise on this subject is the opinion of Chief-Justice Green, in *Gough* v. *Bell, 2 Zab. 453–470.*

The legislature has for one hundred and forty years recognized the rights of shore-owners below high water mark.   And here I

refer to the facts and authorities collated by Chancellor Zabriskie, in *Stevens* v. *Railroad. P. L. p. 139, l. 25, to p. 144, l. 33.* See, too, the report of riparian commissioners of 1865 (*p. 63, 65*), where they say they are not prepared to take the lead in advising that the shore-owner has not the vested right, the preference in sale; which is the right of adjacency. See, too, riparian commissioners' report of 1872, *p. 70.* Fisheries are devised by will, conveyed by deeds, and recorded by actions of ejectment, and yet no grant from the state.

In the report of Aaron Ogden, Alexander McWhorter, William S. Pennington, James Parker, and Lewis Condict, commissioners on the controversy with the state of New York. And in the report made to settle the same controversy in 1828, by Commissioners Richard Stockton, John Rutherford, Theodore Frelinghuysen, Lucius Q. C. Elmer and James Parker.

A general custom existing from time out of mind has the same force as a general grant, a law or act of parliament. *Matter of Drainage along Pequest River, 12 Vr. 179; 6 Peters 714; Arnold* v. *Mundy, 1 Halst. 1; Gough* v. *Bell, 2 Zab. 441, 462; Bell.* v. *Gough, 3. Zab. 625; State* v. *Jersey City, 1 Dutch. 625; Keyport Steamboat Co.* v. *Farmers Transportation Co., 3 C. E. Gr. 516; Barnett* v. *Johnson, 2 McCart. 489; State* v. *Brown, 3 Dutch. 13.*

Let me call attention to two public statutes. One is entitled "An act to authorize the owners of land upon tide water to build wharves in front of the same," passed March 18th, 1851, (*P. L. of 1851*), *p. 71.* The other act is the supplement to the riparian commissioners' act, passed March 31st, 1869. (*P. L. of 1869, p. 44.*)

7. Let me now call attention to the majority opinion of the court in *Stevens* v. *Railroad.*

The question is properly stated to be whether the owner of land on tide water has such a right to the use of the water, that the state cannot destroy or abridge that right without compensation. In other words, has the shore-owner any rights in the

use of the water? for a right can be taken from no citizen without compensation, unless he forfeits it.

As to the case of *Royal Fishery of the Baune, Davies 149,* ("*Mich. 8, Jacobi.*") The case involved the question of right to a salmon fishery in the river Baune, in Ulster, Ireland, and had nothing to do with the Thames in London. What is quoted in *Stevens* v. *Railroad,* as having been "said," in that case, was something said either by the reporter himself or by the court *arguendo.*

The opinion in *Stevens* v. *Railroad* particularly refers to *Attorney-General* v. *Chambers, 4 De G., M. & G. 206,* for the purpose of showing that the riparian owner has no property rights, and, of course, that he has not the most valuable of these rights, that of adjacency to the water, which is the right which we now contend for. The syllabus shows the only point decided in this case, and is as follows, viz. : " In the absence of all evidence of particular usage, the extent of the right of the crown to the seashore, landwards, is *prima facie* limited by the line of the medium high tide between the springs and the neaps." The opinion refers to vol. IV., p. 99, of *The Law Magazine and Law Review,* and then says: "We are also to bear in mind that the seashore [in England] could be granted in gross—that is, without being parcel of the upland." In the article in the magazine I find this statement: " The proprietor of the adjacent soil has sometimes been said to be the only person to whom the foreshore can be granted out, and in America this seems to be the settled doctrine; but here, as has been stated by high authority, ' it may belong to a subject, and to him in gross, which possibly may suppose a grant before time of memory,'" and refers to *Harg. Law Tracts 26.* The opinion says: The royal right in tidal waters is " admitted in its fullest extent in the conspicuous modern cases—*Lord Advocate* v. *Sinclair of Foss, L. R. (1 Scotch App.) 174; Gaun* v. *Free Fisheries of Whitstable, 11 H. of L. Cas. 192.* If there is anything in those cases that militates against the property rights of the riparian owner in the adjacent water, examining the cases will disclose it.

The lord chancellor (Chelmsford) in *Lord Advocate* v. *Sinclair of Foss:* \* \* "According to the familiar law in Scotland, salmon fishings are *inter regalia,* and *prima facie* crown property, and a subject can only establish his right to them against the crown by clear proof of title in himself." Thus it appears that the case was one in relation to the "law in Scotland," that it was one relating to the right to a fishery, and was decided under a Scotch statute relating to prescription.

*Gaun* v. *Free Fishers of Whitstable, 11 H. of L. Cas. 192.* This was an appeal brought under the common law procedure act. The action was debt, the plaintiffs claiming the sum of one shilling from the defendant as a toll or anchorage due in respect to his vessel having cast its anchor within the limits of the plaintiff's free fishery in Whitstable Bay. The defendant pleaded never indebted. The respondents (plaintiffs) claimed that, by virtue of the grant to them of the fishery, they were entitled to demand toll for anchorage of every vessel casting anchor, as they had done immemorially. The court held that the original title of the crown to the beds of navigable rivers &c. was for the benefit of the subject, and could not be used in any manner so as to derogate from or interfere with the right of navigation, which belongs by law to the subjects of the realm; that the right to anchor is a necessary part of the right of navigation; and that, therefore, the respondents, as grantees of the crown, necessarily took subject to the right, and were not entitled to the toll. The case did not decide that the beds of navigable rivers belonged to the crown. They assumed that, and decided that the crown's ownership was for the use or benefit of the subject, and if granted away, the grant was not to derogate from the rights of the subject.

There is but one answer to these questions—but one answer that renders these enactments constitutional—and that is, that the owners of lands along tide water have the property rights of adjacency to the water, which this state thus emphatically admits it is bound to respect. The state owns all the tidal water and all the soil under it, and the owner has the property right of access to that highway—it is the chief value of his land.

This right is property. The house of lords say so. The justices of the supreme court of the United States say so. The authors of treatises say so. The judiciary of New Jersey have said so. The legislature of New Jersey, by these enactments, say so; and, I submit, the court is bound to give this significance to the statute of 1869, that it may be constitutional.

The opinion refers to *Gould* v. *Hudson River R. R. Co., 2 Seld. 522,* affirming the supreme court, *12 Barb. 616,* which decides that the riparian owner on the Hudson river below tide water has no claim for damages against the railroad company for constructing their railroad in the river in front of his land. They are not referred to, but this case was followed by *Tillotson* v. *Hudson River R. R. Co., 5 Seld. 575,* and *Getty* v. *Hudson River R. R. Co., 21 Barb. 617.*

Land titles in New York and Pennsylvania are derived from the state; in the western states, from the United States; in New Jersey, from the crown of Great Britain. In *Cox's Institutes of the English Government, pp. xlv., xlvi.,* we are told that the legislative power of the crown over colonies differs materially from the crown power over domestic legislation, and that as to colonies, it is sufficient to establish local legislation. See, also, *pp. 30, 31; 1 Bla. Com. 107, 108;* and *Cowp 204,* where Lord Mansfield asserts the king's legislative authority over colonies. *Christian's notes to 1 Bla. 107.* Chief-Justice Green, in *Gough* v. *Bell, 2 Zab. 441,* in speaking of the local common law of this state giving the riparian owner the right to wharf out, says it may possibly have had its origin in some early ordinance or statute, which is now lost.

And when we couple what Lord Hale said (*Harg. Law Tracts 277*) as to the propriety of the crown, even in England, recognizing the title of the land-owner to lands left by the sea, with this power of the crown to legislate for the colonies, it is very probable that the local common law, which we will abundantly show to exist, did originate in an ordinance from the crown, as was the case in Massachusetts, where, by an ordinance in 1681, it was provided that the proprietor of land adjoining the sea should hold to low-water mark. The ordinance was annulled, but the

local common law remains, and such is the law to-day in Massachusetts and in Maine. *2 Zab. 468, 469 ; Storer* v. *Freeman, 6 Mass. 435 ; Sale* v. *Pratt, 19 Pick. 191 ; Angell 225, 226.* At all events, a local common law exists here, giving the riparian owner rights to the adjoining waters, which did not exist in the state of New York, and therefore *Gould* v. *Hudson River R. R. Co.* and the cases that followed it, are not law for this state.

The chief-justice, in *Stevens* v. *Railroad,* to show that a riparian owner has no property rights on navigable water, cites *Wilson* v. *Blackbird Creek, 2 Pet. 245,* as deciding that a statute of Delaware, authorizing one of its citizens, for the purpose of improving his lands, to close the mouth of a navigable creek, was constitutional, and that the act done under it was legal. It appears that what the case did decide was that the act was not in conflict with the power of congress to regulate commerce; that it was "an affair between the government of Delaware and its citizens," and that it "must be supposed to abridge the rights of those who have been accustomed to use it;" that is to say, a wrong or injury which the United States could not redress, and which must be left to the courts of Delaware.

Chief-Justice Beasley refers to *King* v. *Smith, Doug. 441,* to sustain the majority view. It was this: The defendants were indicted for cutting down one of several piles making a tow-path in the Thames, placed there by the city of London. The question submitted was whether the title to the bed of the river was in the city or in the owners of the adjoining ground. The crown having given the city of London a grant of the Thames, the title was held to be in the city. The case in no manner conflicts with the right of the riparian owner at common law to have adjacency to the water, which is the one right the common law gives.

We have thus far insisted that the riparian owner has the property right of adjacency to the water, by force of the common law. It is settled by all the cases in New Jersey, that when the shore is reclaimed, the reclaimant has title. The chief-justice, in *Stevens'* v. *Railroad,* recognizes the local common law; says: "That in order to enable the riparian owner to fill in or wharf out below the line of high water, it was absolutely necessary to

adopt some principle different from those of the common law. * * * It was indispensable to invoke the sanction of local usage variant from the common law." All we claim is, that the common law secured to the riparian owner adjacency to the water.

But the chief-justice then insists that this local common law only gave the riparian owner a property right or title to the reclamation when he, with the inactive acquiescence of the state, had made it, and did not give him a right to make the reclamation. In that proposition we cannot concur. The state, when acting in the capacity of an owner of merchantable. property, assumes the characteristics of a citizen, and the common law itself, without invoking the aid of a local custom, would go as far as the chief-justice makes the local common law extend, and the local common law, by becoming common law, would not exist, while it is admitted to exist. The common law would give the riparian owner a property right to such reclamations as the party having the title had acquiesced in his making.

Mr. William Griffith, in 1821, thus states the riparian rights and local custom in New Jersey :

"Persons whose lands are bounded on rivers in New Jersey, by titles. derived under the grant of Charles II. to his brother James, Duke of York (March, 1663–4), have always claimed and exercised the right of several fishery in front of their lands; and this as well in fresh-water streams and rivers as on rivers where the tide flows." *4 Griffith L. Reg. 1286.* "It may be stated generally, therefore, that in New Jersey the owners of lands bounded on rivers or waters, of whatever description, have the exclusive legal right to the possession and enjoyment of fisheries established in front and on their own shores." *Id. 1288.* "This species of property, from the earliest times, has the subject of exclusive enjoyment and alienation, like any been other." *Id. 1290, note 1 ; Arnold v. Munday, 1 Hal. 1.*

The opinion in *Stevens* v. *Railroad* says that it appears, by *City of Georgetown* v. *Alexandria Canal Co., 12 Pet. 94,* that congress authorized the erection of a canal in the Potomac, although admittedly injurious to the riparian owners. The

Am. Dock and Imp. Co. v. Trustees of Public Schools.

case was this: The bill was filed by the city of Georgeown, complaining of the Alexandria Canal Company, and alleging that it was engaged in constructing an aqueduct over the Potomac river at Georgetown, within its corporate limits,. immediately above and west of the principal public and private wharves of the town; that the Potomac, above and below the aqueduct, continuously outward to the sea, was a public navigable highway; and that the free use of the river was secured to all the people residing on its borders or interested in its navigation, by a compact between the states of Virginia and Maryland in 1785; that the canal company had constructed a massive stone pier, and were about to construct others; that by the use of clay and earth, thrown in to make close certain coffer-dams used by the company in the construction of the piers, the harbor had been injured &c. The questions involved were: 1. The power of congress to authorize the work, which was decided in the affirmative. 2. Whether congress had authorized it, which was decided the same way. 3. Whether the work was a nuisance, which was decided in the negative, for the reason that the work was authorized. 4. Whether, in case it were a nuisance, the complainants (corporate authorities of Georgetown) had any right to institute the suit to enjoin it, which was decided in the negative, for the reason that they had not averred or proved that they were· the owners of property liable to be affected by the nuisance, if such, and that were, in fact, affected injuriously.

The opinion in *Stevens* v. *Railroad* also refers to *Glover* v. *Powell, 2 Stock. 211.* In 1760, the legislature of New Jersey authorized meadow-owners to build a dam at the mouth of Little Timber creek, for the improvement of their meadows. (The creek emptied into the Delaware, and the tide ebbed and flowed in the creek, and the dam prevented the flow of the tide upon the meadows). In 1854, the legislature declared the creek a public highway, and authorized the town committee to remove the dam (erected nearly one hundred years before). The bill was filed on behalf of the land-owners, to enjoin the removal of the dam. The chancellor held that the act of 1760 was valid;

that the legislature had a right to authorize the dam, there being "nothing in the case to show that it ever was a navigable stream, or that a boat of any size ever passed up it," (*p. 221*). That the act of 1854 violated the United States constitution, by impairing the obligation of a contract. That it violated the New Jersey constitution, by taking private property &c. without compensation—rights having vested, and valuable property having been acquired under the act of 1760. That a diminution of value of property was a taking of it. The defendants also insisted that the authority to erect the dam was a revocable license; but the court did not agree with them, saying (*p. 223*): "The construction  *  *  *  contended for by the defendants cannot be admitted." The complaint was not that the dam injured any riparian owners, but that it was an obstruction to navigation.

The case of *Gough* v. *Bell* was not affected by the wharf act of 1851. That action was commenced in 1843, was tried December, 1844, and set aside. *1 Zab. 157.* The second trial was November, 1848, and a case was reserved and decided July term, 1850, and this final judgment was affirmed June term, 1852. *3 Zab. 624.*

Justice Elmer says : "Directly after the first decision of the supreme court in this case (*1 Zab. 167*), the legislature, by an act approved March 9th, 1848, provided that it shall be lawful for the owner and holders of all docks and wharves to use, possess and keep in order the same, and to demand and recover wharfage and dockage for the use thereof. By a subsequent act, approved March 18th, 1851, passed after the final decision which is now before us, shore-owners are empowered to build on or otherwise improve the same to low-water mark, without restriction, and below that line by obtaining a license in the manner therein prescribed. These acts conform to the interpretation of the common law adopted by the court, and serve to show the necessity that was felt to protect rights acquired under the usage before supposed to be legal." *3 Zab. 667.* Judge Valentine, who only recognized the qualified right of the riparian owner, as stated, manifestly considers that he has rights under the act

Am. Dock and Imp. Co. v. Trustees of Public Schools.

of 1851. *Page 708.* Of course the right to wharf carries with it the right of adjacency. *Bell* v. *Hull and Selby R. R. Co., 6 M. & W. 699; Keyport Steamboat Co.* v. *Farmers Trans. Co., 3 C. E. Gr. 516.*

The wharf act of 1851 (*P. L. of 1851 p. 71*) was repealed, as to the lands and waters in question, by the act of 1869. *P. L. of 1869 p. 44 § 3.* For its repeal, it gives the riparian owner the compensation of pre-emption (*P. L. of 1869 p. 50 § 8*), and payment for all his rights and interest in the lands and water in front of him, in the event of his not taking the grant (*P. L. of 1869 p. 51 § 13*); but now it is proposed that the state repudiate the compensating provisions of the repealing act. The act of 1869 (*P. L. of 1869 p. 45*) says: "Said repeal [of the act of 1851] shall not be construed to restore any supposed usage, right, custom or local common law founded on the tacit consent of the state, or otherwise, to fill in any land under water."

The opinion in *Stevens* v. *Railroad* holds the statute of 1851 to confer on the riparian owner a mere revocable license. I have given my reasons for dissent from this conclusion. The following are the two cases adduced to support the position. The court will judge whether they do so. The first case is *Susquehanna Canal Co.* v. *Wright, 9 Watts & S. 9.* This case involved the construction of an act of the Pennsylvania legislature, made in 1803, whereby it was enacted that Wright, his heirs and assigns, "shall have the liberty, and are hereby authorized and empowered to lead off on the said river [Susquehanna], a part of the water out of the said river, for the supply of such water-works, as he, the said William Wright, his heirs and assigns, may see fit to erect thereon, * * * provided always, that the said William Wright, his heirs and assigns, in building such dam and leading the water out of said river, do not infringe on or injure the rights and privileges of any individuals, nor in any wise impede or obstruct the navigation of the same." In afterwards (in 1836) incorporating the Susquehanna Canal Company, the legislature provided for ascertaining any damage occasioned by any injury to any rights, privileges or property conferred on Wright by the act of 1803. The court held that the proviso in

14

the act of 1803 was an " express saving of the public naviga-
tion, and, consequently, of the ancillary right to improve it."
In other words, the privileges conferred by the act of 1803
were expressly subject to public navigation, and the right of our
legislature to provide for its improvement by the canal; so that
Wright had no " rights, privileges or property " under his act
that were impaired; or, rather, what he considered an injury
was the exercise of a right reserved.

The other case referred to is *New York and Erie R. R. Co.* v.
*Young, 33 Pa. St. 175.* The injury complained of was caused
by throwing dirt over the bank of the Susquehanna river, so
as to make an embankment along the shore; and by carrying
out the bank at one place where there was a natural projection
called the pond, so as to divert a portion of the water from
the plaintiff's mill, and fill up the channel to the same. The
court say (*p. 180*): " The injury complained of by the plain-
tiff below was not for a taking of his property for the con-
struction of the defendant's road, but for a consequential injury
to it, resulting from the location and construction of the road;
and which ensued, not from any wanton disregard of his rights
or negligence in doing their work, but from the location and
construction alone. * * * It has been held by this court
* * * that the grantees of such a franchise have the same
power that existed in the state, and may exercise it, subject only
to such restrictions as are imposed in the grant, and that they are
subject only to the same liability, unless otherwise declared.
Such grants are always supposed to be for the public benefit,
and to be exercised with that view by the corporation rather
than by the state itself. In the cases cited, the doctrine has
been distinctly held, and is the settled law of the land, if any-
thing can be settled, that unless the act of incorporation provides
for it, consequential damages are not recoverable from a railroad
or other improvement company in constructing or maintaining
their works. * * * The act of assembly does not require
the company to pay consequential damages, and none were
recoverable from them."

We submit that no case can be found that holds that where

the state has granted a power to be executed by private expenditure, thereby creating or enhancing the value of property—that the grant can be revoked after it is accepted. Of course, if this statute is only declaratory of a right given by the local common law, the repeal of the act does not affect the right.

*Mr. John W. Taylor,* for appellants.

I. The object of this suit is to quiet title to the lands in the bill described &c.

II. The suit is maintainable both on the general principles of equity jurisprudence and under the act of 1870. *Rev. p. 1189.*

On general principles of equity. See *Story's Eq. Jur. (12th ed.)* § *700, and note 4,* § *711 a; Wait's A. & D. pp. 182, 189, 219, 683; Bispham's Prin. of Eq.* § *575; High on Inj. (1st ed.)* §§ *269, 270, 367; Hilliard on Inj. (3d ed.) p. 249* § *125; Tucker* v. *Kenniston, 47 N. H. 267, 270–2,* and cases there cited.

(2) Under the statute.

The act is remedial, and should be construed liberally. See *Holmes* v. *Chester, 11 C. E. Gr. 79; Bogert* v. *Elizabeth, 12 C. E. Gr. 568, 571; Southmayd* v. *Elizabeth, 2 Stew. Eq. 203; Ludington* v. *Elizabeth, 5 Stew. Eq. 159.*

The limitations put upon the scope of the act in *Lembeck* v. *Jersey City, 4 Stew. Eq. 255,* do not exclude this case.

III. (1) The defendants (respondents in this court) answered to the merits of the bill, and thereby (without objection) submitted to the jurisdiction of the court, and the objection, after answer and on the motion for injunction, comes too late. *1 Dan. Ch. Pr. (4th ed.) 550* § *555 and note 3; Story's Eq. Pl.* § *485; Mitf. Eq. Pl. (by Jeremy) 153; Cooper's Eq. Pl. 160–2; First Cong. Soc. in Raynham* v. *Trustees, 23 Pick. 148.*

2) The objection should have been raised by demurrer to the jurisdiction—1. In writing; 2. Within the time limited by law, and 3. With an affidavit annexed.

(3) This objection is in the nature of a demurrer *ore tenus*, which can be entertained—1. Only at the hearing, and 2. When there is a demurrer on the record. *1 Dan. Ch. Pr. (4th ed.) 588; Story's Eq. Pl. § 464.*

(4) A trial at law is unnecessary.

The essential facts upon which the right depends are established or admitted, and the principles of law are settled; and the court may apply the principles as settled by the courts of law, to these facts, and allow the injunction. *Hackensack Imp. Co.* v. *Midland Ry. Co.*, *7 C. E. Gr. 94; Beach* v. *D. & R. Canal Co., Id. 130.*

(5) If a trial at law is necessary, it may be had pursuant to the act, on the application of either party. See *Rev. p. 1190 § 5.*

IV. The title of the appellants (complainants below), or of the American Dock and Improvement Company, is clear on the facts.

(1) The act of 1860 (*P. L. of 1860 p. 21*) authorizes the Central Railroad Company " to extend their railroad from some point in their track in the city of Elizabeth to some point or points on New York bay, in the county of Hudson, at or south of Jersey City" &c., with all the powers of the former charter, and provides that nothing therein " should be construed to prejudice the claims of riparian shore-owners " &c.

(2) There can be no doubt that the extension was authorized to some point or points on tide water.

*a.* The word " on " does not mean " to."

Notice the meaning of " on," *3 Zab. 634.*

*b.* A point south of Jersey City could hardly be limited to the banks or *ripa*.

(3) The railroad company became the owners of the *ripa* in 1863, under the requirement to refrain from prejudicing the claims of riparian owners.

*a.* The act left a discretion in the company as to the mode of satisfying or extinguishing the claims of such owners.

*b.* The state recognized that there was something in these " claims," or it would not have provided against injury to them.

*c.* In requiring the company to refrain from prejudicing the " claims " it necessitated large expenditures.

(4) The state has solemnly recognized the Central Railroad Company's ownership of all the lands it acquired, with all the rights incident to such ownership.

(5) The rights of adjacency, reclamation &c. were incident to the ownership—1. At common law generally ; 2. Under the local common law of New Jersey, 3. Under the " wharf act."

(6) It is respectfully submitted that the opinion of the majority of the court in *Stevens* v. *Paterson and Newark R. R. Co.* was not called for by the pleadings, and should not be regarded as a binding decision.

(7) The English decisions (cited and quoted in Mr. Frelinghuysen's brief, and in the pamphlet comprising charters &c.) are not founded on statute. The rights held to be in the riparian owner, existed by common law, and are recognized by statute— by providing a statutory mode of obtaining compensation when those rights are taken away or impaired—by the exercise of the powers of eminent domain. See *1 Redf. on Railw. (4th ed.) 309 ; Godefroy & Shortt on Railw. 195.*

(8) The American Dock and Improvement Company had a right to acquire the lands in. question under its charter, and to improve and reclaim them.

(9) Having the right to do so, it did acquire the lands in question (*i. e.,* the lands owned by the Central Railroad Company) October 15th, 1866, and has ever since held them legally or equitably ; for even after the conveyance to Mr. Johnston, in trust, the dock company continued to hold the equitable title, which, in this court, is as good and as much entitled to recognition and protection as the legal title would be in a court of law.

V. The West Line grant was void.

(1) The state did not own the lands at the time of the alleged grant ; the full title being in the dock company, as hereinbefore shown.

(2) The attempted grant impaired the obligation of a contract,

and was the taking of private property without compensation, and was therefore void.

(3) Even if the shore-front had not been reclaimed, the complainants had a right of pre-emption under the act of 1869.

(4) The act of February 29th, 1874 (§ 9), was not a grant of land, but only a permission or license to acquire lands under water that might " happen to come within the location of the route " of the West Line road, if and when extended, and which should belong to the state, on complying with the riparian acts, and on such terms as might be imposed by the riparian commissioners. *21 Am. L. R. 131–2.*

VI. The objections in regard to parties are not well founded.

(1) The American Dock and Improvement Company holds the equitable title to the reclaimed lands, Johnston, the trustee, holding only the bare legal title, and himself having a suit pending in the federal courts, rendering it proper to make him a defendant in this suit.

(2) The Central Railroad Company and its receiver are shown by the bill to have an interest in the premises and in the question.

The agreement or covenant in the grant of 1874, for a conveyance or release of the premises to it, in a certain contingency, makes it proper that the railroad company and receiver should be joined as complainants.

(3) Both the railroad company and Van Horne have an interest jointly in the *ripa,* three feet wide.   The bill (*pp. 4, 5*) shows that the release by the railroad company to Van Horne was to be only for the reclaimed portion of the premises.   The language is : "And the said company agreed that it would release its interest in that part west of Henderson street, (afterwards Jersey avenue was substituted) which might be filled in " &c.   The agreement was fulfilled by the release subsequently made.

VII. But all the parties in interest are before the court, and the decree made in the cause will affect and bind them all.   If Johnston, as naked trustee, should be joined with the dock company as complainant, and Van Horne made a defendant or

struck out altogether, the court will order it to be done at the proper time without prejudice to the right to an injunction. See *Elmer* v. *Loper, 10 C. E. Gr. 475; McIntyre* v. *R. R. Co., 11 Id. 425; Simon* v. *Townsend, 12 Id. 302.*

VIII. It is insisted, however, on the part of the trustees, and the chancellor holds, that the trustees cannot be sued, because they are the agents of the state, while the state itself is not subject to a suit, because it is a sovereign. It is submitted that the view of the learned chancellor is erroneous.

(1) In the first place, the chancellor bases his opinion, in part, at least, on the assumption that a decree for specific performance is prayed against the state or the trustees. There is no such prayer.

(2) While it is conceded that the state cannot be prosecuted directly by a citizen in its own courts, without its consent, it is submitted that the cases cited by the chancellor in support of the view that the trustees cannot be sued, show, on critical examination, that they are amenable to suit. See, especially, *Michigan State Bank* v. *Hastings, 1 Doug. 225; Same* v. *Hammond, Id. 527,* (both of which overrule *Michigan State Bank* v. *Hastings, Walk. Ch. 9*); *Osborn* v. *United States Bank, 9 Wheat. 251.*

(3) If the trustees for the support of public schools are not suable, because they "are the mere agents of the state," are they not, by parity of reason, precluded from suing in their own names?

They have always brought suits in their own names, and not in the name of the state, and no one has ever questioned their right; and yet their capacity to be sued is as unquestionable as their power to sue in their own names.

(4) They are a corporation, consisting of the governor, president of the senate, the speaker of the house of assembly, the attorney-general, the secretary of state, and the comptroller (including the chief magistrate of the state, and its highest law officer, the proper representatives of the sovereignty), "and their successors in office, to be known by the name, style and title of

'The Trustees for the Support of Public Schools.'" (*Rev. p. 1081 § 65*).

The name of the corporation is "the very being of its constitution." *Ang. & Ames on Corp.* § *99.* See, also, *Kyd on Corp. 68, 70 ; 2 Kent's Com. 224; Rev. p. 175 § 1 ; 3 Stew. Eq. 667 ; 4 Id. 290 ; High on Inj. (2d ed ) §§ 1308–9; People of N. Y. v. Canal Board of N. Y., 55 N. Y. 390.*

IX. The injunction should stand until final hearing. The matters involved are closely and indissolubly blended with the merits. If the complainants show ultimately, when the evidence is all in, all the matters in issue fully examined, and the law applicable thereto thoroughly considered, that the prayer of the bill ought to be granted, they will likewise show that a preliminary injunction should have been granted and continued. *High on Inj.* §§ *269, 270 ; Freeman on Ex.* § *438 ; Holmes* v. *Chester, 11 C. E. Gr. 79 ; Johnson v. Vail, 1 McCart. 423.*

There can be no doubt that a sale in the case at bar would throw a cloud on the complainant's title, considering the fact that it is founded to a large extent on matters *in pais,* and not on a record title. See *High on Injunc.* §§ *269, 270 ; Freeman on Ex.* § *438 ; Pettit* v. *Shepherd, 5 Paige 493 ; Oakley* v. *Trustees, 6 Paige 262 ; Budd* v. *Long, 13 Fla. 288 ; Wilson* v. *Butler, 3 Munf. 559 ; Downing* v. *Mann, 43 Ala. 266 ; England* v. *Lewis, 25 Cal. 337 ; Annis* v. *Myers, 16 How. (U. S.) 492 ; Croffer* v. *Coburn, 2 Curt. C. C. 465 ; McCulloch* v. *Hollingsworth, 27 Ind. 115 ; Bach* v. *Goodrich, 9 Rob. (La.) 391.*

*Mr. John P. Stockton, Atty-Gen.,* for the respondents.

I. The complainants are estopped by the order of this court, by the bond and by the circumstances in the answers set forth, from asking a stay of the sale in respect to the alleged superior title. The said bond is a pledge to the court and the trustees, and a consent that the title the trustees sold under the decree should be sold again, and not another or a different title.

The trustees having obtained a decree to foreclose the West Line mortgage, and having issued thereon an execution, and

having advertised the property for sale, were stayed by injunction out of the federal court, from May 5th, 1876, till November 30th, 1878, when the injunction was declared to be null for want of prosecution. The property was sold to Lloyd Chamberlin, December 26th, 1878. January 6th, 1879, the receiver (Lathrop) filed a petition in the New Jersey court of chancery to set aside the sale. April 7th, 1879, the New Jersey court of chancery made an order reciting that the court, on the petitions of receiver of Central company (Lathrop) and receiver of West Line company (Larned), had made an order to show cause why sale should not be set aside and for the hearing thereof, and then ordered that the " petitioners " should furnish a bond " conditioned that the mortgaged premises shall, on a resale thereof being had under the said execution, bring the amount that shall then be due for debt, interest and costs on the said execution, together with the lawful expenses of both of said sales," and recites that bond was given and the order for sale set aside. The bond is not in the form of an agreement. But, in equity, a bond conditioned that it shall be void if a certain act is done, is an agreement to do the act. Nor will equity permit the payment of the penalty of the bond to be performance of such agreement, but will require a specific performance of the agreement. *Logan* v. *Weinholt, 1 Cl. & Fin. 611–623, 630, 633; Burrows* v. *Gore, 6 H. of L. Cas. 950; Chilliner* v. *Chilliner, 2 Ves. Sr. 528; Story's Eq. Jur.* § *715.*

When a man covenants to do a certain thing, it is necessarily implied that he will not willfully incapacitate himself from doing it. *McIntyre* v. *Belcher, 14 C. B. (N. S.) 654; Stirling* v. *Maitland, 5 B. & S. 840.* Stipulations which are necessary to make a contract reasonable are implied, in respect of matters concerning which the contract manifests no contrary intention. *Jones* v. *Gibbons, 8 Exch. 922; Field* v. *Lelean, 6 H. & N. 617; Hutton* v. *Warren, 1 M. & W. 475.* An injunction is the act of the party applying for it. *Doughty* v. *Doughty, 2 Stock. 347, 350; West Jersey R. R.* v. *Thomas, 8 C. E. Gr. 440; Platt on Cov. 322; 2 Sugd. on Vend. 476; Selby* v. *Chute, 1 Brownl. 23.*

Words of condition effectual to create estoppel. *Big. on Est.*

*295, 300, 303.* Condition of a bond which does not recite appointment of collector, but merely is conditioned that he shall act faithfully as collector, estops him from saying he was not collector. *Billingsley* v. *State, 14 Md. 369.* The bond is a consent to a sale. *Simmond's Estate, 19 Pa. St. 440.*

In *5 East 271,* A covenanted with B to collect certain debts, and to settle all differences by leaving the adjustment to an arbitrator. B, by marriage, incapacitated the arbitrator from making an award to bind her. Gross, J., said : " We cannot arrest the judgment if, upon the whole record, it appears that the defendant has committed a breach of the covenant." Lord Ellenborough, C. J., said : " That if a party made a covenant, and then disable himself from performing it, the covenant will be broken." *Lovering* v. *Lovering, 13 N. H. 513 ; Hopkins* v. *Young, 11 Mass. 306.*

Where a party stipulated to convey an estate to another at a future day, and in the meantime conveys it to a third person, he is guilty of a breach of his stipulation. *Heard* v. *Bowers, 23 Pick. 455 ; 2 Wait's Act. and Def. 405 ; 1 Bac. Abr. (Am. ed.) 307 ; Vinyor's Case, 8 Co. 82 ; Warburton* v. *Storr, 4 B. & C. 103.*

Whether the submission be by a judge's order or instrument of the parties, it may be equally revoked before it is made a rule of court ; but a revocation afterwards would be a contempt. *1 Bac. Abr. (Am. ed.) 307,* cites *Milne* v. *Gratrix, 7 East 608 ; Cumberland* v. *N. Yarmouth, 4 Me. 459 ; Haskell* v. *Whitney, 12 Mass. 47 ; Frets* v. *Frets, 1 Cow. 335 ; Russell on Arb. 57 ; 63 Law Lib. 97 ; Platt on Cov. 55, 58 ; Harcourt* v. *Ramsbottom, 1 Jac. & Walk. 511.*

Chancellor Williamson said, in *Doughty* v. *Doughty, 2 Stock. 347 :*

" That when a court of equity has, by the solicitation of a suitor invoking the aid of the court for his relief, interfered with the legal rights of another and impaired his legal remedy, it is the duty of this court to protect the party whose rights have been thus interfered with."

Chancellor Zabriskie said, in *West Jersey R. R. Co.* v. *Thomas,*

*8 C. E. Gr. 440 :* "A court of equity would never set aside an award because not delivered in time, when the delivery was restrained by injunction at the suit of the party making the objection."

In *Stirling* v. *Maitland, 5 B. & S. 840,* Cockburn, C. J., said : " I look on the law, that if a party enters into an arrangement which can only take effect by the continuance of a certain exist- ing state of circumstances, there is an implied engagement on his part that he shall do nothing of his own motion to put an end to that state of circumstances, under which alone the arrange- ment can be operative." *Allamon* v. *Albany, 43 Barb. 34.*

In *M'Intyre* v. *Belcher, 14 C. B. (N. S.) 654* : Where an agreement for the sale of the good-will of a medical practice, stipulated for value, *inter alia,* that the vendors should not, within ten years from the date of the agreement, practice at the *locus in quo,* or within ten miles, the purchaser to pay the vendors, at the end of each of the first four years, one-fourth of the gross earnings, provided they did not fall below £300, it was held that there was an implied contract by the purchaser to carry on the practice. *Randall* v. *Lynch, 12 East 179 ; Logan* v. *Wembolt, 1 Cl. & Fin. 630 ; Philadelphia, Wilmington and Baltimore R. R. Co.* v. *Howard, 13 How. 307.* See, also, *Big. on Est. 30 ; 2 Smith's Lead. Cas. 795.*

II. There is no specific equity stated in the bill to give the court jurisdiction. It does not fall within the jurisdiction of a court of equity to try the validity of mere legal titles. There must be some specific equity to give the court jurisdiction. A bill to establish a legal title is never entertained unless there are particular circumstances stated in it, showing the necessity of the court's interposition, either for preventing multiplicity of suits or for an injustice irremediable at law ; nor by the ordi- nary jurisdiction of this court, will a suit lie for that purpose, by the introduction of an allegation of clouding the title, unless the possession of the plaintiff has been previously disturbed by legal proceedings on the part of the defendant.

Bills to remove clouds on a title are a branch of the *quia timet*

jurisdiction of courts of equity.   *Story's Eq. Jur.* §§ *700, 701 ; Bogert* v. *Elizabeth, 12 C. E. Gr. 568 ; 5 Ves. 618 ; 1 Madd. 135, 140, note.*

Lord Thurlow observes, in *Weller* v. *Smeaton, 1 Bro. C. C. 573 : "* Most of the cases on the subject had been looked into, and it was found that in no instance, except that of *Bush* v. *Western, Prec. Ch. 530,* had this court ever interfered in a mere question of right between A and B, they having an immediate opportunity of trying the right at law, which would be definitive." *Jersey City* v. *Lembeck, 4 Stew. Eq. 272 ; Smith* v. *Collyer, 8 Ves. 90 ; Duvall* v. *Waters, 1 Bland Ch. 585 ; Stark* v. *Starrs, 6 Wall. 408 ; 2 Sch. & Lef. 208 ; 15 Cal. 257 ; Waddell* v. *Beach, 4 Hal. Ch. 299 ; 1 Stock. 795 ; De Groot* v. *Receivers &c., 2 Gr. Ch. 199 ; Welby* v. *Duke of Rutland, 6 Bro. P. C. 575 ; Haythorn* v. *Margerum, 3 Hal. Ch. 324 ; Stewart* v. *Coalter, 4 Rand. 74.* See, also, *2 Mod. 234 ; Harrison* v. *Hogg, 2 Ves. Jr. 323 ; Overseers of Poor* v. *Hart, 3 Leigh 3 ; Hoboken Land and Improvement Co.* v. *Hoboken, 4 Stew. Eq. 461 ; McClave* v. *Newark, 4 Stew. Eq. 472 ; Lehigh Valley R. R. Co.* v. *McFarlan, 4 Stew. Eq. 754 ; State Maryland* v. *Jarrett, 17 Md. 330 ; Shepley* v. *Rangley, Davies 242 ; Cox* v. *Clift, 2 Comst. 118 ; Sullivan* v. *Finnegan, 101 Mass. 447 ; Clouston* v. *Shearer, 99 Mass. 209 ; Weller* v. *Smeaton, 1 Cox C. C. 102 ; 2 Waterman's Eden on Injunc. 423.*

III. The government cannot be sued except by its own consent, given by statute.   Consequently, its own creatures or agents employed under its own authority for the fulfillment merely of its own legitimate ends, cannot be enjoined, as the courts posseses no power to enforce their decree against it. *Lodor* v. *Baker, 10 Vr. 50 ; Montgomery* v. *Trenton, 11 Vr. 89 ; Schooner Exchange* v. *McFadden, 7 Cranch 136 ; Hill* v. *United States, 9 How. 386 ; State of Georgia* v. *Stanton, 6 Wall. 75 ; Cherokee Nation* v. *Georgia, 5 Pet. 1 ; Hosner* v. *De Young, 1 Tex. 769 ; Delafield* v. *State of Illinois, 2 Hill (N. Y.) 159, 160 ; Garradnis* v. *Bright, 1 Barb. Ch. 157 ; Walker* v. *Wells, 17 Geo. 547 ; 16 Vin. Abr. 566 pl. 16, 23 ; Id. 567 pl. 30, 32, 33 ; Johnson* v. *Towsley, 13 Wall. 73 ; Trustees of Public Schools*

v. *City of Trenton, 3 Stew. Eq. 683* ; *Duke of Norfolk's Case, 2 Dyer 139 a* ; *Thompson v. Commrs. of Canal Fund, 2 Abb. Pr. 248* ; *Frewin v. Lewis, 18 Eng. Ch. 253* ; *State v. Governor, 1 Dutch. 351* ; *People v. Navarroe, 22 Mich. 1.*

IV. The bill presents no case ·for an injunction. A thing being done in good faith for the public benefit will not be enjoined, even at the instance of the attorney-general. Nor will the court in such cases interfere until the rights of the parties are settled at law. *Morris and Essex R. R. Co. v. Pruden, 5 C. E. Gr. 537* ; *Allen v. Freeholders of Monmouth, 2 Beas. 68* ; *High on Injunc. p. 10 § 13* ; *Society &c. v. Butler, 1 Beas. 199* ; *Sugar Refining Co. v. Jersey City, 11 C. E. Gr. 207* ; *Coe v. Midland R. R. Co., 1 Stew. Eq. 27; Chicago v. Frary, 22 Ill. 34* ; *Montgomery v. Trenton, 11 Vr. 91; Rex v. Terrott, 3 East 506* ; *Amherst v. Somers, 2 T. R. 372* ; *Attorney-General v. Hill, 2 M. & W. 160* ; *Chicago v. Miller, 80 Ill. 384.*

V. Complainants are not entitled to an injunction, because they are in laches. If a party is guilty of laches, or unreasonable delay in the enforcement of his rights, he thereby forfeits his claim to equitable relief; more especially where a party, being cognizant of his rights, does not ·take those steps to assert them which are open to him, but lies by and suffers other parties to incur expense and enter into engagements and contracts of burdensome character. *Joyce on Injunc.*

. The knowledge of counsel in a particular transaction is notice to his client. *May v. Leclaire, 11 Wall. 217.*

*Mr. R. Gilchrist,* for respondents.

I. The English cases, cited to show that there are in England property rights of adjacency, and of access, do not show this, but the contrary ; all of them being cases where the decisions depended on statutory provisions, securing compensation to a riparian owner though he was not injured, but only " injuriously affected;" or compensation was given outright by statute. *Duke of Buccleuch v. Metropolitan Board of Works, L. R. (3*

*Exch.) 306 ; Re Penny, 7 El. & B. 665 ; Bordentown v. Camden and Amboy R. R. Co , 2 Harr. 319, 320 ; Borden v. Runyon, 2 Gr. 473 ; Barney v. Keokuk, 4 Otto 324.*

II. The *Stevens Case, 5 Vr. 537, 554,* is not open to the observation that the questions it decided were not up, or that the opinions were extra-judicial. This case arose out of the denial of an injunction by Chancellor Zabriskie to Stevens. He said the right must be tried at law first. The action which was the subject of the decision in *5 Vr. 537, 554,* was brought for the very purpose of deciding the question decided. *Stevens v. Paterson and Newark R. R. Co., 5 C. E. Gr. 135.*

III. Even if the *Stevens Case, 5 Vr. 537, 554,* did not deprive the complainants of an injunction, that same case in equity, in *5 C. E. Gr. 126,* a year and a half before, is decisive that there should be no preliminary injunction. Chancellor Zabriskie an injunction in that case on the denied ground that the law was unsettled. Now, it is settled against the claim of complainants to any of their rights. The chancellor refused the injunction in a case almost all fours with this, on the ground that the law was doubtful. On what ground can an injunction now be granted when the highest court of the state has decided that the riparian owner has no property rights, and that the state had the right and power to make a grant to a stranger ?

IV. The covenant is void. The main ground on which this point rests is, that two years before the covenant was made by the riparian commissioners, the state by the ninth section of act of February, 29th, 1872 (*P. L. of 1872, p. 313*), vested all the moneys to be paid for the West Line grant, in the trustees for the support of public schools, and appropriated the same to that fund ; and on the 19th of March, 1872, when the grant was authenticated and its boundaries fixed by the riparian commissioners, and the mortgage given to the trustees, the title to the mortgage was in the trustees.

The answer insists that the deed in which the covenant is contained is void, as impairing the grant to the West Line under which trustees claimed—all public grants containing an implied

covenant not to re-assert title. *Fletcher* v. *Peck, 6 Cranch 136, 137; Dartmouth College Case, 4 Wheat. (Marshall, C. J.) 627; Washb. 656, 658; Story 683-4, 687, 689.*

V. Defendants are not bound to submit to a preliminary injunction or forthwith return, or offer to return, the consideration for the void covenant. A complainant in equity seeking, not to enforce, but to be relieved from a covenant void at law, may be required to offer to return the consideration; but a complainant seeking in equity to enforce a void covenant is in the same position in equity as he is at law; the defendant can plead the illegality just as he could at law, and is bound to offer nothing. Equity follows the law in such case, as is illustrated in the old usury cases, and many others.

The legislature is forbidden to do it. If the legislature cannot itself do it, neither can any of its agents. The complainants were bound to take notice of the want of power of the public agent with whom they dealt. *Whiteside* v. *United States, 3 Otto 256-7.* Though the state through its legislature, or through a legislative agent, or any of its officers, accepted the money for the consideration of such a contract, the contract is not ratified or affirmed, for neither the legislature nor its agents could originally have made it. *Maxwell* v. *Goetschius, 11 Vr. 389.* The money received for the covenant (if any was received) was received by the trustees, as agents for the state, from the state. All their money is so received. Whatever was received on the West Line grant was so received. All they have was so received, and for all of it they are answerable to the state only. Where the agent is well known, and a public officer, there is no liability to third persons. *Colvin* v. *Holbrook, 2 N. Y. 126; Whart. on Agency § 517; Chitty on Cont. 899, 900; Jones v. Carter, 8 Q. B. 134; Stephens* v. *Badcock, 3 Barn. & Ald. 354.* Even the state cannot recover against a deputy sheriff who collects public revenue which he ought to have paid into the treasury. Action must be against sheriff. *Harlan* v. *Lumsden, 1 Duv. (Ky.) 87; Owen* v. *Gatewood, 4 Bibb 494; Bank of United States* v. *Bank of Washington, 6 Pet. 19.*

Am. Dock and Imp. Co. v. Trustees of Public Schools.

But, again, there is no equity in this suit—for a return of the consideration of the covenant, though void—and though they offered to rescind the whole bargain and reconvey the whole property—seven hundred acres—conveyed by the deed of 1874, in which the covenant is contained. Even if the complainants were the mortgagors in the mortgage of the West Line company, and were parties to the foreclosure, and the money paid for the void covenant got into their hands and might be got back out of the school fund by an action, it could not be set off or affect the old mortgage or delay its collection. *White* v. *Williams, 2 Gr. Ch. 376*, and the numerous cases there cited; *Dolman* v. *Cook, 1 McCart. 57, 68;* *Dudley* v. *Bergen, 8 C. E. Gr. 401.* There has been no breach of the covenant, whether it be valid or void; and none threatened, and there will be none if the sale takes place; and no injury can therefore take place by not returning the money. Unless a sale will be a breach of the covenant, the complainants cannot restrain it, no matter how much money the complainants paid to get the covenant.

The whole argument on this point and the alleged equity for delay by reason of the covenant, rests on the *premise* that the state had not the power and right to make the West Line grant, because the complainants were the owners of the *ripa* and had the property rights of access and adjacency, and were, at least, entitled to pre-emption. The West Line grant is not only a grant; it is a law, and repeals the statute of 1869, *pro tanto.* *Schulenberg* v. *Harriman, 21 Wall. 62;* *United States* v. *Repentigny, 5 Wall. 211, 218.* The act of 1869 did not bind the state itself to give a pre-emption. The state is never bound by its own laws unless the intention is plain and clear. *Trustees* v. *Trenton, 3 Stew. Eq. 683;* *United States* v. *Repentigny, 5 Wall. 211, 267, 268;* *Schulenberg* v. *Harriman, 21 Wall. 62, 63.*

VI. True construction of the covenant is not that the trustees have no right to sell until it is determined whether West Line title is valid, or until the West Line title is established as valid against complainants' title. If the preliminary injunction is refused, their rights will stand just as good after it as before.

Am. Dock and Imp. Co. *v*. Trustees of Public Schools.

A *lis pendens* is all they want.  A preliminary injunction has been refused in a like case to stay a sale.  *Osborn* v. *Taylor, 5 Paige 515.*

VII. The *locus in quo*.  [Explanation of maps and location of premises ; also, various motions and legal proceedings relating to this and other causes involving the same premises].

VIII. The complainants are not in peaceable possession, and have not had peaceable possession, nor is their title equitable.

The peaceable possession is certainly a requisite to the maintaining of a bill to remove a cloud from a title.  *Lembeck* v. *Jersey City, 4 Stew. Eq. 264, 272, 273.*  Though there is possession, if it be fraudulently taken or continued, it will not answer the purpose.  *Huntington* v. *Allen, 44 Miss. 662; Collins* v. *Thomas, 1 F. & F. 416.*  If a tenant of another hands over his possession, and party filing bill takes it, he will not be allowed to make such possession a ground for the bill, though fraud cannot be proved.  It is enough that the complainant so gets possession.  *Harden* v. *Jones, 86 Ill. 313; Comstock* v. *Henneberry, 66 Ill. 212.*  In such cases the strait is of his own making.  In such cases equity don't interfere.  *Doughty* v. *Doughty, 2 Stock. 350–1.*  Possession is not peaceable within act on clouds on title or equity jurisdiction on clouds, if it even be merely inequitable.  *Francis's Maxims 6; 1 Wait's Act. and Def. 728; 10 Ves. 306; Boyd* v. *Thompson, 13 Sm. & M. 344.*  Possession obtained against the will of owner is a forcible possession, and not such possession as is required to maintain bill to remove cloud.  *Croff* v. *Ballinger, 18 Ill. 250.*  If it is obtained in an illegal or unlawful manner, bill will not lie.  *Tichnor* v. *Knapp, 6 Oreg. 205.*  If the facts cast a strong suspicion on the title, out of the way of which another title is asked to be moved, the other title will not be removed.  *Huntington* v. *Allen, 44 Miss. 667.*  If the complainant has only a quit-claim deed, he will not be relieved.  It is suspicious.  *Kerr* v. *Freeman, 33 Miss. 269.*  The title to be removed must be colorable at most; but must be colorable only.  The other title must be clear.  *Orton* v. *Smith, 18 How 263.*  There must be more than a claim.  There must be title,

and set out in pleadings. The statute cannot be construed literally. *Starb* v. *Starr, 6 Wall. 410.* A party claiming a right means a party having a right. *Bridge Proprietors* v. *Hoboken, 2 Beas. 99, 100, 101, 539, 541, 554, 555.* A party getting into possession after warning not to do so, must leave to the party entitled, the time when the question is to be settled. Disregard of notice is fraud. *Wade on Notice* §§ *9, 49, 50, 89, 90, 93.*

Assertion of title by the legislature of this state is, when it makes a grant, much more than by a private individual. It is equal to entry. It is equal to a judgment of forfeiture. *Schulenberg* v. *Harriman, 21 Wall. 63, 64; United States* v. *Repentigny, 5 Wall. 211, 268.* At common law the king was always in possession. *Dyer 139 b; 16 Vin. Abr. 536, 564, 566; Brookes's Abr. tit. Prerogative pl. 55.* State has many prerogatives—as to convey though not in possession, when by a statute it is provided that all such conveyances are void. *Brady* v. *Begum, 36 Barb. 533.* By all the authorities, a decretal order got by covenantor, restraining a covenantee from exercising his right to land conveyed, is a disturbance, and makes the possession unpeaceable and a violation of the covenant for peaceable and quiet enjoyment. *Hunt* v. *Danvers, T. Raym. 370; 2 Sug. on Vend. 746; Dart on Vend. 367.* This decretal order, and the agreement that the injunction should stand, make a much stronger case of disturbance of the possession than a disturbance by the mere commencement of a suit, which is held to be enough to make a possession unpeaceable and unquiet. *Stewart* v. *West, 2 Harr. 338, 539.* It is in numerous cases held to the effect—but nowhere stated so sharply as in *Gray* v. *Hastings, 39 Cal. 367*—that "it is enough that the true owner asserts his title and demands the possession," to constitute a breach of the covenant for quiet and peaceable enjoyment.

The cases deciding what is a violation of a covenant for quiet enjoyment and peaceable possession, may show what is peaceable possession. *2 Sug. on Vend. 746; Platt on Cov. 322; Powell* v. *May, 9 C. E. Gr. 179; Hunt* v. *Danvers, T. Raym. 371; Dart on Vend. 367; Rawle on Cov. 145; Selby* v. *Chute, 1 Bro. C. C. 23; Dietrichsen* v. *Colburn, 2 Phill. 52; Drew. on Juris. 273;*

*Frances's Case, 8 Co. 91 b; 2 Steph. Nisi Prius 1083; Andrews* v. *Paradin, 8 Mod. 318; 4 Rob. Prac. 32.*

IX. They have not such title as entitles them to injunction against a *bona fide* claimant, for any purpose—much less to compel him to stay a sale under a decree by which they will not be bound. To get an injunction even to stay waste, the title must be sworn to, and sworn to not merely on information and belief. *Drew. on Inj. 187.* There must be positive evidence of title. *Davis* v. *Leo, 6 Ves. 784, 787.* There must be positive evidence of title—information and belief not enough. *High on Inj. §§ 984, 985, 986, 987; Kerr on Inj. 237.* Courts don't interfere by injunction if complainant's title is doubtful. *Field* v. *Jackson, Dick. 599.* Nor if the law is doubtful. *5 C. E. Gr. 135–138, 455.*

It is a bill in form to remove a cloud, but in fact and substance a bill to try not even the state's title, but the state's power and right to convey to the West Line company. This is the real object. A bill to try that question might lie, if there had not been extraordinary laches, and if it were alleged that there was no suit pending and that claimants or state would not bring an action in which question could be tried, and it were not a mere question of law already settled against complainants. *Hodges* v. *Driggs, 21 Vt. 282–3.*

Where a party does, as complainants did, get an injunction in 1876, and never renew it, as was necessary—so that, after delaying the trustees for two years and eleven months, it was declared gone, by laches; and they admit the court never had a right to grant it—the court will hold that the complainant does not consider the case to be urgent. Injunctions do not go before decree, except on the ground that to wait for the decree would be productive of great and unknown mischief to the complainants. Such supineness prevents the court interfering until final hearing. *Peckford* v. *Grand Junction, 3 Railw. Cas. 558, 559; Doughty* v. *Doughty, 2 Stock. 350, 351.* The title of the state is "notorious." *Cooper* v. *Bloodgood, 5 Stew. Eq. 212.*

These circumstances of a desperate claim and extraordinary

laches are as much against an injunction as the fact would be if the defendants were in adverse possession or made a fair show of title, which the court would not enter into, as in *Shreve v. Black, 3 Gr. Ch. 185, 186.* In *Shields* v. *Arndt, 3 Gr. Ch. 234,* it is held that in cases of doubt as to the title, the court will not interfere by injunction. So held in *Outcalt* v. *Disborough, 2 Gr. Ch. 217.* He must show a sufficient title. *Ib.; Kerlin* v. *West, 3 Gr. Ch. 453.* Title must be shown by the bill. *McGee* v. *Smith, 1 C. E. Gr. 463; Morris Canal* v. *Central R. R. Co., 1 C. E. Gr. 425, 438.* · The court will not go out of the record. Though an act is public unless the special clause is stated in the bill, the court will not permit the case to be put on it. *Bailey* v. *Birkenhead, 12 Ves. 433; 6 Railw. Cas. 526; 14 Jur. 119; Godef. & S. on Railroads, 2, 314.* It will be seen that the court never interferes to remove a cloud unless it is apparently a good title. *Gamble* v. *Loop, 14 Wis. 465.* The plaintiff must clearly show the validity of his title. *Watts* v. *Lindsay, 7 Wheat. 242.* When complainant's title is doubtful, there is no right to remove a cloud. *1 Wait's Act. and Def. 666.* See, generally, *Stew. Dig. tit. Injunctions—Granting 619–627.* The pretence that they could purchase riparian rights because they were a corporation, and acquire the riparian right—though not authorized to do so—is answered by the cases of *Chamberlain* v. *Chamberlain, 33 N. Y. 439; Potter on Corp. p. 47 § 28.* If they do purchase, no direct proceeding is necessary to get back for the state what they thus attempt to acquire. If the state grants its rights to anybody, it is equal to entry for forfeiture. *Schulenberg* v. *Harriman, 21 Wall. 62, 63.* It is a good ground to deny or dissolve injunction, that the complainants have got a stay order or an injunction not presenting the whole case. *High on Inj. § 11; Canton Co.* v. *Northern R. R. Co., 21 Md. 383; Reddan* v. *Bryan, 14 Md. 444; Drew. on Inj.*

X. A suit is pending to test and enforce the title, which is claimed to be a cloud. It is necessary to allege, in a bill to remove a cloud, that no suit is pending. See the authorities in first part of eighth point, also *McClave* v. *Newark, 4 Stew. Eq.*

*472.*  Any new matter must be put in issue by the answer, and there is no other way of doing it.   The answer and the replication put in issue all the facts stated in the answer.   *1 Dan. Ch. Pr. (2d Am. ed.) 462 ; Atwood* v. ――, *1 Russ. 355.*

XI. The defendants may impeach the complainants' title, though they should have the nominal title to the *ripa.*

The truth is, the doctrine that no one can impeach a corporation's title for want of power to take a conveyance, is and always has been, from the time they bought out the dock company, in 1866, the sole reliance of the complainants to hold on to what they should seize. The question really is not whether there is the corporate power, but what is the boundary of the alleged grant by the state ; and to settle that, the question of power must and can be settled.   The state may, at any time, without *quo warranto,* by any indication of its intention, make a grant of lands which have become forfeited.   It is not necessary to have any direct proceeding to settle this.   If the state asserts its right, it is enough.  *Schulenberger* v. *Harriman, 21 Wall. 63, 64 ; United States* v. *Repentigny, 5 Wall. 211, 218.*   See *State* v. *Newark, 1 Dutch. 317,* that validity of a purchase by a corporation depends upon its power.

*Mr. Thomas N. McCarter,* for the executors of Asa Packer.

The question involved in the present motion is, whether the chancellor should have granted an injunction to restrain the trustees for the support of public schools from proceeding to sell the premises at Jersey City known as the West Line grant, or whether, on the other hand, he did right to discharge the rule to show cause, and vacate the stay, which, pending the rule, prevented such sale.

The trustees have a mortgage given to them by the New Jersey West Line Railroad Company, in securing a portion of the purchase-money for a tract of about fifty-eight acres, granted to the New Jersey West Line Railroad Company by the legislature of this state, by act of the legislature approved February 29th, 1872.

The mortgage has been foreclosed in the court of chancery, a decree for the sale of the premises has been entered, and an execution is in the hands of the sheriff of Hudson county.

The appellants, who were complainants below, seek to have a sale under that execution enjoined, on the ground that they have title to the premises covered by the mortgage and *fieri facias*, by grants from the state, prior to the West Line grant, and by other title paramount to that, and that a sale under this mortgage will cast a cloud on their title, and therefore it should be enjoined.

The chancellor denied the injunction for reasons stated in his opinion, reported in *5 Stew. Eq. 428*. His decision was based mainly on the ground that the trustees for the support of public schools were mere agents of the state, and that the suit was virtually against the state, and, as such, could not be maintained.

It is manifest, however, that the hearing of this appeal necessarily involves a discussion of the whole merits of the controversy, and on this argument respondents rely, not alone upon the reasons assigned by the chancellor, sufficient and satisfactory as they are, but also on many other cogent reasons which he did not deem it necessary to consider.

I. On well-settled principles regulating the practice of courts of equity in granting injunctions (without regard to the merits of the controversy), the complainants are not entitled to an injunction to stay the proposed sale.

The object of the bill is declared to be to have the foreclosure sale perpetually enjoined, and to have the West Line grant declared invalid and void, and to restrain any one claiming thereunder from setting up such title against complainants, and from disturbing complainants in their possession, and to remove the cloud the grant casts on the title of complainants.

This case comes, then, directly within the operation of that long-established and well-settled rule of equity law as to injunctions, that a preliminary injunction will not be granted except to prevent an irreparable injury. This rule has been so recently vindicated and re-affirmed in the court of errors in this state, in the case of *Citizens Coach Co.* v. *Camden Horse R. R. Co., 2*

*Stew. Eq. 299,* that no additional citation of authorities can be requisite for its establishment. *Wilkins* v. *Kirkbride, 12 C. E. Gr. 93*

It is so familiar and elementary that the title acquired under a foreclosure sale creates no new right—it only extinguishes an equity of redemption, and remits the purchaser to precisely such title as the mortgagor had when the mortgage was given—that no authority is necessary for its establishment. The purchaser at such a sale acquiring only what was conveyed by the mortgage; no more, no less. If any authorities are needed for such a proposition, the following abundantly sustain it: *Thompson* v. *Boyd, 2 Zab. 549; S. C., 1 Zab. 64; Van Wagenen* v. *Brown, 2 Dutch. 196; Duncan* v. *Smith, 2 Vr. 325; Mulford* v. *Peterson, 6 Vr. 131; Chiswell* v. *Morris, 1 McCart. 102; Eldridge* v. *Eldridge, 1 McCart. 195; Den* v. *Van Ness, 5 Hal. 102; Woodhull* v. *Reid, 1 Harr. 128; Stow* v. *Tifft, 15 Johns. 460; Cowles* v. *Cheever, 1 Cow. 479; Holcomb* v. *Holcomb, 2 Barb. 23; Frost* v. *Kern, 30 N. Y. 467; Holbrook* v. *Finney, 4 Mass. 57; Eyster* v. *Gaff, 1 Otto 521.*

In fact, the question now being discussed may be said to be. *res adjudicata* on that very point. In the case of *Trustees for the Support of Public Schools* v. *N. J. West Line R. R. Co., 3 Stew. Eq. 494,* the present complainants, represented by Mr. Lathrop, receiver, applied to the court of chancery to have a sale heretofore made, under this same execution, set aside, and a further sale enjoined until the dispute about the title could be settled. The court held the sale irregular, and set it aside, but it expressly decided that so far as Mr. Lathrop's adverse claim of title was concerned, that gave him no standing to attack the sale. The judgment of the chancellor in that case was affirmed in this court, without any expression of dissent from the views thus expressed by him. *4 Stew. Eq. 295.* I look upon the judgment of this court in that case as conclusive against Mr. Lathrop, in this or any other cause where the same point is in controversy, and especially as that petition prayed for a stay of the sale on the same ground as the present bill, and that was denied. *Gregory* v. *Molesworth, 3 Atk. 626.* In fact, the complainants' bill

prays for a decree against any purchaser at any future sale, which undoubtedly was inserted by the experienced pleader who drew this bill, in view of the well-settled and almost elementary principle, that a purchaser at such sale pending this suit will be bound by whatever decree is made in the cause. *Haughwout* v. *Murphy, 1 C. E Gr. 544,* and the authorities cited in that opinion. *Eyster* v. *Gaff, 1 Otto 521; Osborn* v. *Taylor, 5 Paige 576.* The case of *Holmes* v. *Chester, 11 C. E. Gr. 79,* is not in conflict with this view. There the cloud would have been greatly increased by a sale, which was not on a mortgage; for that reason, the chancellor allowed an injunction. The question there was not whether an injunction was proper, but whether the bill could be maintained at all. It was a demurrer, and all that was decided was that the bill was well filed.

Another equally well settled rule in regard to granting or withholding an injunction, is: An injunction ought not to be granted when the benefit secured by it to one party is but of little importance, while it will operate oppressively and to the great annoyance and injury of the other party, unless the wrong complained of is so wanton and unprovoked in its character as to properly deprive the wrong-doer of the benefit of any consideration as to its injurious consequences. *Morris and Essex R. R. Co.* v. *Pruden, 5 C. E. Gr. 520.*

There is another consideration which, by well-settled rules, deprives these complainants of all right to an injunction. It was decided in this court, in *Morris Canal Co.* v. *Central R. R. Co., 1 C. E. Gr. 419,* that to entitle a party to an injunction, his title to the property and rights claimed by him, and for the protection of which he asks the interposition of this court, must appear in a clear and satisfactory manner. The whole case is important, not only on this question of injunction, but on other questions that are to be discussed in the case. *Stevens* v. *Newark and Paterson R. R. Co., 5 C. E. Gr. 126.* See *Orton* v. *Smith, 18 How. 263–5.*

II. The second point of objection to the allowance of this injunction is that complainants are estopped from asking for this injunction by the conduct of the receiver, Lathrop, who now

represents all the complainants in the suit, and by their laches and delay in prosecuting their claim. This estoppel as to the conduct of the receiver grows out of the fact before adverted to, that in order to obtain from this court an order setting aside the sale of these premises to Chamberlain, the receiver of the Central ·Railroad Company, Mr. Lathrop, with Mr. John Kean, vice-president of said company, in compliance with the terms of said order, which was granted in part on Lathrop's application, made in the same right and interest as that which he represents here, entered into a bond in the penalty of $200,000, conditioned that on a resale the property shall bring the amount then due on the *fieri facias*, debt, interest and costs, with the lawful expenses of both sales. I contend that such a bond, with such a condition, amounts to a covenant that the obligor will not prevent a sale; and if a sale is defeated by his act, it is a breach of the condition of his bond. *Vinyor's Case, 8 Coke 81; Platt on Cov., 55–58 (3 Law Lib. 25); Russell on Arb. 57, 101, 149; Billings on Awards 263, 264; Watson on Arb. 22, 23 (11 Law Lib. 12); Id. 214 (11 Law. Lib. 11); King v. Joseph, 5 Taunt. 452; 3 Add. on Cont. p. 459 § 400; 2 Wait's Act. and Def. tit. Covenant 405,* and cases cited; *Warburton v. Storr, 4 B. & C. 103,* and cases cited; *Pope v. Lord Duncamon, 9 Sim. 177; Morse v. Merest, 6 Madd. 26; Harcourt v. Ramsbottom, 1 Jac. & W. 485; Heard v. Bowers, 23 Pick. 455.* In *Rex v. Wheeler, 3 Burr. 1256,* an attachment was issued against a suitor for contempt, who, having agreed to a reference, filed a bill in equity to avoid the award. See, also, *Hilton v. Hopwood, 1 Marsh. 66.*

Ordinarily, as the authorities show, if the obligor defeats the condition of his bond, it destroys the condition of the bond and makes it single; but this is a bond to the court. It is a file of this court, and cannot be prosecuted, except by order of the court; and the complainants know very well that if they can make this court the instrument of defeating the sale, they need not apprehend a prosecution on the bond. See, in support of the principle above contended for, *Bond v. Hopkins, 1 Sch. & Lef. 434; Doughty v. Doughty, 2 Stock. 347; West Jersey R. R. Co.*

Am. Dock and Imp. Co. v. Trustees of Public Schools.

v. *Thomas, 8 C. E. Gr. 440 ; Puttney* v. *Warren, 6 Ves. 73 ; 2 Story's Eq. Jur.* § *1316 a &c.*

Again, Mr. Lathrop is estopped from obtaining an injunction to delay this sale by his laches, and that of the company he represents.  It is a well-settled rule of this court, that if a party desires the extraordinary aid of this court, he must come promptly. If complainants have slept over their rights, have seen defendants making contracts and expending large sums of money, and taken no steps to restrain them, it is fatal to the application. *Scudder* v. *Trenton Delaware Falls Co., Sax. 695 ; Trustees of Newark Co.* v. *Gilbert, 1 Beas. 78 ; Carlisle* v. *Cooper, 3 C. E. Gr. 241–247; Scanlan* v. *Howe & Curtis, 9 C. E. Gr. 273 ; Easton* v. *N. Y. & L. B. R. R. Co., 9 C. E. Gr. 50 ; Liebstein* v. *Newark, 9 C. E. Gr. 200 ; Lewis* v. *Elizabeth, 10 C. E. Gr. 298 ; Kerr on Inj. p. 206* ¶¶ *13, 14; Id. p. 299* ¶ *15 ; Id. p. 349* ¶ *30 ; Id. p. 406* ¶ *13.*  This delay could not have been from ignorance, for they aver in their bill that soon after the grant was passed, they decided to take legal measures to protect their rights.  They rested, how ever, nearly four years, within which time the mortgage had been foreclosed at great expense, and the property advertised, and about $500 more incurred by the trustees of the school fund in costs; and then, instead of coming to this court, they went to the United States court, which had no jurisdiction to grant an injunction, and which even had no jurisdiction of the parties, except by a colorable and fictitious deed, such as the supreme court, in *Barney* v. *Baltimore City, 6 Wall. 287, 288,* characterized as an imposition on the court, and as having no other object than to hinder the trustees in the collection of their debt, obtained an injunction which stayed the sale illegally for nearly three years, in plain and direct violation of the act of congress.  And when they were finally driven from that refuge, they set aside the sale that was made, and now come and ask for an injunction, and aver their intention to keep this sale delayed, if possible, until the end of a suit in the United States supreme court, thus causing five years more of delay.

III. An examination of complainants' bill shows such radical defects as to the parties, and such an absence of equitable right to relief, and such an imperfect title in complainants, that it is quite plain that complainants cannot ultimately succeed in this cause; and for that reason no injunction should be granted, but the bill should be dismissed.

*First,* as to the objection to the bill as to the parties. The bill is fatally defective in that respect, for three reasons :

(*a*) John Taylor Johnston, who is joined as a defendant, should have been a complainant.

(*b*) John Van Horne has no standing, and if he has, he cannot be properly joined in this suit as a complainant.

(*c*) The Central Railroad Company and its receiver have no title which gives them the right to bring such a bill or join as complainants in it.

(*a*) As to John Taylor Johnston. He is made a defendant, when he should be a complainant in the cause. Johnston is trustee, and the dock company is the *cestui que trust.* In such cases, the rule is that they shall be joined as complainants. *Perry on Trusts p. 802 § 886; Reed* v. *Sparks, 1 Moll. 10; Hughes* v. *Key, 20 Beav. 395; Hosking* v. *Nichols, 1 Y. & Coll. 480; Mitf. & T. Plead. and Prac. 17,* citing *2 Bland 264, 292.* The following cases in New Jersey recognize the principle: *Dunn* v. *Seymour, 3 Stock. 220; Nichols* v. *Williams, 7 C. E. Gr. 63; Stillwell* v. *McNeely, 1 C. E. Gr. 305; Elmer* v. *Loper, 10 C. E. Gr. 480.*

(*b*) John C. Van Horne is improperly joined as a complainant in this suit. As the title now stands, John C. Van Horne has no interest whatever in the largest portion of the West Line grant. Nor has the dock company in the residue. Can two several owners of contiguous tracts unite in such a bill to remove a cloud on their titles, merely because when their several holdings were once owned by one owner, the adverse title clouded the whole? There is no allegation that these parties have any joint interest, nor is there the slightest allegation that their joinder is required to prevent multiplicity of suits. Here is a plain misjoinder. *Story's Eq. Pl. 289; 1 Dan. 350; Mar-*

*selis* v. *Morris Canal Co., Sax. 31–37.* An injunction was denied in this case, for this reason. *Hinchman* v. *Paterson H. R. R. Co., 2 C. E. Gr. 75.* In this case, the chancellor cites with approbation the case of *Hudson* v. *Madison, 12 Sim. 416; M. & E. R. R. Co.* v. *Pruden, 5 C. E. Gr. 530; Hendrickson* v. *Wallace, 4 Stew. Eq. 604.* If that be law, any outsider may buy in an outstanding claim to mortgaged premises, and without possession file a bill and enjoin the collection of a mortgage, on the ground that a sale would cloud his title. See *Orton* v. *Smith, 18 How. 263.*

(c.) Neither the Central Railroad Company nor its receiver, have any such title as will enable them to maintain such a suit as this, or to join as complainants therein. It appears that the American Dock Company conveyed about half the premises in dispute to John Taylor Johnston, together with the right to use the basin constituting the other half. From this it is manifest that the whole legal and equitable title to the *locus in quo* is out of the Central Railroad Company.

The only grounds alleged in the bill as reasons for the Central Railroad Company's claim, are :

*First.* That that company owns almost all the capital stock of the dock company, and as guarantor of $3,000,000 bonds of the dock company, which are secured by mortgage to the trustees, covering the West Line grant; and

*Second.* That the Central Railroad Company took a grant from the state to the property of the dock company, surrounding the *locus,* with a covenant, that in case the state had not the right and power to vest the title in the West Line company, it would, without further consideration, except $1, release to the Central Railroad Company all its right, title and interest in the West Line grant. As to the first of these grounds : The fact that the Central Railroad Company is a stockholder, large or small, in the corporation which claims title to the lands in dispute, does not make it a necessary or proper party to a bill filed by such corporation to quiet its title to the disputed land. It is a well-settled rule that a suit to quiet title, and remove a cloud, can only be brought by the parties in possession. *Shapeley* v.

*Rangeley, 1 Woodb. & M. 213; Orton* v. *Smith, 18 How.263; Devonshire* v. *Newenham, 2 Sch. & Lef. 199, 208.* Such, also, is our statute in regard to titles. In fact the whole argument in the case of *Lembeck* v. *Jersey City* above cited, shows that such suits are only designed to relieve parties in possession.

But secondly—The so-called grant from the state gives the Central Railroad Company no standing in this court. The grant of itself excludes or excepts the land covered by the West Line grant. The covenant is not for title, but for a release of the state's rights, free of encumbrances. Was it ever heard before that a party having no title or possession, but a mere covenant for a release on the happening of an uncertain and future contingency, can entertain a bill of peace to quiet title? Now if that covenant was valid and binding it only becomes operative when it shall have been determined that the state had no right and power to vest the title in the West Line Railroad Company; but that is no longer an open question in New Jersey. It has been settled that the state has the right and power by the cases heretofore referred to, notably the case of *Stevens* v. *Newark and Paterson Railroad Co., 5 Vr. 532; Pennsylvania Railroad Co.* v. *New York and Long Branch Railroad Co., 8 C. E. Gr. 157.*

III. Complainant has not by his bill shown any right to equitable relief.

*First.* As to the point that a bill of this kind cannot be entertained to draw into a court of equity the discussion of a question of title to land, see Mr. Stockton's brief, in which the question is so fully discussed that the argument need not be repeated here. I will insist, notwithstanding the chancellor's opinion to the contrary, that this bill cannot be sustained by invoking to its aid the provisions of the act " to compel the determination of claims to real estate in certain cases, and to quiet the title to the same," for various reasons.

*First,* the bill is not framed so as to bring the case within the provisions of that act. *Rev. p. 1189.*

Again. The act in question only relates to persons who are in peaceable possession of lands in this state, and to cases where

no suit is pending. Now it is admitted in this bill that, in January, 1870, the attorney-general of this state instituted a suit to restrain the Central Railroad Company from taking possession of this tract, and that such suit is still pending. This allegation, so delicately made, is more fully explained by the answer, which shows not only that such a suit was commenced, but that complainants were actually enjoined from taking possession, and that all the possession they have acquired since then has been in violation of the injunction of this court. Such a possession is in no sense peaceable. A possession thus obtained is not such peaceable possession as was held in *Powell* v. *Mayo, 9 C. E. Gr. 178,* but when it is disputed and contentious it is not peaceable in a legal sense. *Lehigh Valley R. R. Co.* v. *McFarlan, 4 Stew. Eq. 184.*

*Second.* There is a radical defect in this suit, in that it is in effect a suit against the state of New Jersey, and its object is to restrain officers of the state, in the discharge of the duties of their office, in the collection of the revenues of the state. The general rule is, that while equity may in some cases enjoin the collection of a tax, it will not be done except in case of irreparable injury when there is no adequate relief at law.

To justify the court in granting an injunction in such a case, the bill must contain some particular ground of equitable jurisdiction. *Hoagland* v. *Delaware Twp., 2 C. E. Gr. 106.*

The money here being collected is the principal and interest of a permanent fund irrevocably devoted, both by the constitution and by statute, to a great public use ; to interfere with its administration and collection would cause more difficulty and embarrassment than to stay the collection of the ordinary revenues of the state.

In *Calvert on Parties to Suits in Equity p. 252,* it is said the principle to be extracted from the several cases in respect of suits for the payment of money, is that which was relied upon in *Priddy* v. *Rose.* When the public officer owes a duty to a private person, as when the crown has ordered the money to be paid, then the officer is responsible to that person for an account of it. But if the officer is merely appointed to serve the crown

in collecting money, making schemes of distribution, reporting or advising, then the private individual, on whatever ground his claim may be founded, can have no suit against the officer; he must apply to the crown by petition of right.

It seems clear that an officer of the crown could not be made a party to a suit of which the object was to restrain him from discharging a public duty. *17 Law Lib. 146.*

The following case cited by counsel in *Ellis* v. *Earl Grey, 6 Sim. 220* is in point.

In *Oldham* v. *Lords of the Treasury*, a case in the exchequer, but which is not reported, the king, being entitled to receive a certain sum out of the consolidated fund in respect of the civil list, granted a pension to a party who assigned it. The pension was afterwards revoked, and a new one granted in lieu of it, and the assignee filed a bill against the lords of the treasury to compel them to pay the new pension to him. Graham, Baron, who delivered the judgment of the court, said: "This bill proceeds on the ground of the fundamental jurisdiction of the court over the consolidated fund, and the purpose of the bill is to call on the court to dispose of the money which has been placed by parliament at the disposal of the king himself. The jurisdiction of the court of exchequer extends only to the reaching of the moneys which come into the treasury while they are *in transitu,* but after parliament has disposed of them and they have reached their destination, the jurisdiction of the barons ceases; and here, the king alone can order the payment of the money. The money is granted to the king, his successors and assigns, and the king himself must be sued if this money is to be got at."

The legal constitution of this board of trustees is such that no suit can be maintained against them.

This consideration makes it very clear that the state is a necessary party to this suit, and as the state cannot be sued, it follows that the court has no jurisdiction. *Ex parte Madrazzo, 7 Pet. 627.*

It cannot be answered that when a state commits its property to agents who invest it and take securities such as are usual

between individuals, that the state thereby subjects itself and its agents to the same rules which govern private individuals in like cases. *State, Morris Canal and Banking Co.*, v. *Haight, 7 Vr. 471 ; Transportation Co.* v. *Chicago, 9 Otto 641.*

*Third.* The complainants show no such title in the disputed territory as entitles them to an injunction to quiet their possession without a trial at law.

The proposition that the state is the owner of the land under water, below high-water mark, in its navigable waters, is too well established at this day, so far as New Jersey is concerned, to be capable of dispute, or to require any authority to sustain it. *Stevens* v. *Paterson and N. R. R. Co., 5 Vr. 532 ; Pennsylvania R. R. Co.* v. *N. Y. & L. B. R. R. Co., 8 C. E. Gr. 157.*

So, too, as to the allegation that the title was only to vest on payment of the price fixed by the commissioners, and that $123,000, the amount due on the mortgage, has never been paid. Were this allegation not formally set up in the bill, I should not consider it worthy of a serious answer. A very few words will serve to dispose of it. Payment has, in law and in fact, been made, so that the state is estopped to deny it. The deed from the proper officers acknowledged the payment. The parties who were to receive it have accepted and treated this mortgage as part payment. They have received interest on it, and have foreclosed it, obtained a decree on it, and have, in every possible way, recognized and affirmed its validity. Could the state now be heard to defeat that grant because of non-payment? and, if not, can a stranger? *Schulenberg* v. *Harriman, 21 Wall. 62 ; Lessieur* v. *Price, 12 How. 59, 76 ; Rutherford* v. *Green, 2 Wheat. 196.*

Upon what, then, does the complainants' claim of title rest?

First in the order stated in the bill, comes the claim of title in the Central Railroad Company. It will be observed that though the original title of the state is not disputed, so that the state can be the only source from which the title to these lands can be derived (except the riparian right hereafter referred to), no direct grant or other paper title from the state is set up or

pretended.   The Central company seek to build up their title on foundations which, concisely stated, are as follows:

*First.* The act of the legislature of New Jersey, passed February 23d, 1860, authorized the Central Railroad Company, whose terminus was then at Elizabethport, to extend their road to "some point or points on New York bay, in the county of Hudson at or south of Jersey City, and for that purpose, in its construction and completion, maintenance, use and enjoyment, all and every provision of the act entitled ' An act to incorporate the Somerville and Easton Railroad Company,' and of the several supplements thereto, shall extend and be applicable to the railroad now authorized to be constructed, in every respect as if the same had been originally authorized under the said act to which this is a supplement."

The fourth section of the act enacts " that nothing herein contained shall be construed to prejudice the claims of riparian shore owners."

From this little provision it is argued that the legislature thereby recognize the claims of riparian owners, and that, by necessary implication, the company was invested with the requisite power to acquire or extinguish so much of these rights or claims as would stand in the way of the extension of their road.

Stopping for a moment to consider this argument, if we admit the so-called implication claimed to arise out of that clause of the act which saves the claims of riparian owners from being prejudiced by the act, we can only admit an implication of so much as was necessary for the company to do to prevent the riparian owner from hindering the construction of the work; and as that could be as effectually accomplished by the extinguishment of the riparian owner's claims as it could be by the full acquisition of them, the necessary implication would be satisfied by such extinguishment, and could, of course, extend no farther.

A claim of this character is best answered by quotations from familiar cases, as to what rights a private corporation can acquire by implication as against the public.

16

The whole argument is that because the state, by the proviso in the fourth section, enacted "that nothing herein contained shall be construed to prejudice the claims of riparian shore owners," it thereby, by a necessary implication, authorized the company to buy the claims of such owners; but it also extinguished its own title to all the lands under water in front of such owners. *Pennsylvania R. R. Co.* v. *National R. R. Co., 8 C. E. Gr. 455;* *Delaware Bay Case, 1 C. E. Gr. 372;* *Perrine* v. *Chesapeake and Delaware Canal Co., 9 How. 192;* *Charles River Bridge* v. *Warren Bridge, 11 Pet. 420;* *Commonwealth* v. *Erie and North East R. R. Co., 27 Pa. St. 339.*

The same things are meant to be secured by that part of our state constitution which ordains (Article IV., section 7, clause 4), "To avoid improper influences which may result from intermixing, in one and the same act, such things as have no proper relation to each other, every law shall embrace but one object, and that shall be expressed in the title." Suppose it had been expressed in the title to this supplement that one of its objects was to cede away, without compensation, the right of the state to six hundred acres of its most valuable possessions, how many legislative votes would it have received? If, as counsel for complainants contend, this bill does serve the double purpose of conferring power on the Central company to extend to the New York bay, and also of ceding to it the large tract of land now claimed by it, that very duplicity of object would render it unconstitutional under the clause just quoted.

This doctrine, so forcibly restated by Vice-Chancellor Dodd, was invoked and applied on behalf of the present complainants, in the case of the *Morris Canal and Banking Co.* v. *Central R. R. Co.,* reported in *1 C. E. Gr. 419;* see particularly pages 432 to 436.

It is not my purpose to discuss elaborately or in detail the several propositions which go to make up this remarkable claim of title. I shall content myself with a few general propositions which seem to me to be well established, and which effectually destroy any such pretended title.

*First.* The Central Railroad Company had no right, by its charter, to become riparian owners of the strip around the cove for which it took the deeds as above mentioned.

*Second.* If it could lawfully become the owner of the *ripa*, there was nothing, either in the fact of such ownership or in the company's charter, which extinguished the title of the state to the lands under water in front of the *ripa* or granted such lands to the company.

*Third.* As lawful riparian owners, the only rights which were ever recognized were repealed and abolished by the riparian act of 1869.

*Fourth.* If they had not been repealed, they were never exercised before the state made the grant in 1872, and that grant to another worked a revocation of any pre-existing and not exercised license. The only rights ever recognized as belonging to a riparian owner under the revocable license, were to fill in and reclaim the lands under water in front of and adjacent to the *ripa*, so that such reclamations and fillings-in became accessible and part of the *ripa*, making a new high-water mark. The ownership of the *ripa* never authorized the erection of cribs, bulkheads or other structures on lands of the state in front of, but disconnected with, the *ripa*. *State, Morris Canal Co., pros., v. Haight, 7 Vr. 477.*

*Fifth.* By the true and proper construction of the charter of the American Dock and Improvement Company, the operations of that company and its territorial rights are limited to lands south of the track of the Central Railroad, and said company had no right to acquire land or exercise its franchises within the territory in dispute, which is wholly north of the Central company's tracks.

In addition to the considerations mentioned in the answer and Mr. Gilchrist's argument, I add the following :

(1.) A careful examination of the charter of the American Dock Company shows that it was the intention of the legislature to limit the grant therein contained, and that all parties, public and private, who at the time had to deal with the grant, so construed it.

But (2) it is manifest that all the parties interested so construed and located the grant. Schedule No. 4, which was the commission to the gentlemen selected by the governor to make the measurement, directs them to measure the shore front embraced and contained in the act of incorporation, and then limits it by the boundaries above described.

The commissioners, in their report, adopted the same language. They annexed a map showing the location to be limited, as we claim it, and the American Dock and Improvement Company, by a formal document, under its corporate seal, ratified and approved of the proceedings of the commissioners. Here was not only cotemporaneous construction, but practical location, and such was also the opinion of the Hon. Amzi Dodd, who was called upon by the then governor to pass upon the form of a receipt for the money to be paid for the lands.

The following cases are authority that the acts of officers in construing a law under which they are required to act, although not conclusive, are of great weight: *Packard* v. *Richardson, 17 Mass. 144; Opinion of the Judges, 3 Pick. 518; Edwards* v. *Darty, 12 Wheat. 210; United States* v. *Dickerson, 15 Pet. 161; Greeley* v. *Thompson, 10 How. 234; Union Ins. Co.* v. *Hoge, 21 How. 66.*

Especially is such the rule when such construction has been accepted and acquiesced in by the party affected by it, as in this case. It then becomes practical location. *Opdyke* v. *Stevens, 4 Dutch. 89 ; Bigelow on Est. 160–1.*

Again, it comes within the rule that when a corporation has once exercised its corporate powers, they are exhausted. *Morris and Essex R. R. Co.* v. *Central R. R. Co. of N. J., 2 Vr. 205–208,* and the cases there cited ; *Childs* v. *Central R. R. Co. of N. J., 4 Vr. 327 ; Walford on Railw. 130–1.*

*Sixth.* If we are right in the above propositions, then the fact that the complainant corporations have no power to acquire or hold the lands in question under their respective charters, is available to the defendants in this proceeding. The state, as a defendant in this case, may, by its agents, who are sued, defend its rights to its land by setting up a want of corporate power in

complainants, without being driven to a writ of *quo warranto* to set aside their claims.

The court of chancery in the case of the *Morris Canal Co.* v. *Central R. R. Co.*, denied an injunction on the ground of want of corporate power. See, also, *Morris and Essex Railroad Co.* v. *Newark, 2 Stock. 364.*

*Seventh.* The circumstances disclosed by the answer and affidavits, present a complete answer to so much of complainants' case as rests upon their alleged expenditure and the acquiescence of the state therein, and the case of *Cross* v. *Morristown, 3 C. E. Gr. 305,* in this court, strongly re-inforces the defendants' contention on those points.

*Eighth.* The so-called covenant of the riparian commissioners in their grant to the Central Railroad Company of 1874, cannot in any way impair the title of the state previously granted to the West Line company, nor give the Central company any standing to ask this injunction.

Finally, the receiver of the Central Railroad Company (whose suit this is), stands in no position to ask the relief prayed for in this bill. He was the chairman of the riparian commissioners at the time the boundaries and price of the West Line grant were fixed. From his long acquaintance with the subject matter of the suit, he and his associates in the commission could not have been ignorant of the facts and circumstances now set up to sustain the complainants' claim. These facts and circumstances were fully set forth in the answer of the Central company to the information filed by the attorney-general in 1870. Suppose Mr. Lathrop, instead of being receiver of the Central company, had himself purchased this disputed title from the Central and Dock companies, and filed a bill like this to enjoin the parties claiming under the grant from asserting their title, on the ground that his own previous grant was void, the answer, not only of a court of equity, but of any honest man, would be—

If your present claim is legal, why did you, with knowledge of these facts, exact from the West Line company $125,000 for a title so worthless? Why delude the trustees of the school

fund with an apparent mortgage of $82,000, which you now say is nothing but waste paper? If your action then was in good faith, as no one doubts it was, is it consistent with good faith that you now shall impeach your own grant? If such would be the answer to Mr. Lathrop as an individual, it is equally effectual against his claim as receiver. This court exacts of its receivers no duties, the performance of which would subject them, as individuals, to a suspicion of bad faith.

The opinion of the court was delivered by

DEPUE, J.

By the ninth section of a supplement to the charter of the Passaic Valley and Peapack Railroad Company, passed February 29th, 1872, it was provided "that any lands of the state under tide water, or that have heretofore been under tide water, which shall happen to come within the location of the route or of the depots, stations, or other works of the company, or shall be needed therefor, shall be paid for by the company to the trustees of the school fund of this state; and the boundaries and price thereof shall be fixed by the riparian commissioners on application for that purpose to them, and shall be paid as aforesaid, prior to any filling or improvement thereon herein authorized; and on such payment thereof the title to such land shall vest in said company in fee simple, and a deed therefor may be made by said commissioners, governor and attorney-general, in the name and under the great seal of the state." *P. L. of 1872 p. 312.*

The corporate name of the company was, by the act of February 15th, 1870, changed to that of the "New Jersey West Line Railroad Company." *P. L. of 1870 p. 160.*

The New Jersey West Line Railroad Company having located its route, representing that certain lands, in part under tide water and in part theretofore under tide water, happened to come within the location of the route of the depots, stations, and other works of said company, and were needed therefor, applied for a grant of the same. On the 19th of March, 1872, the governor,

attorney-general and riparian commissioners, pursuant to the ninth section of the act of 1872 above mentioned, executed a grant to the New Jersey West Line Railroad Company for the said lands, for the consideration of the sum of $125,000. The premises granted were described as follows : " Commencing at a point in the east line of Warren street extended southerly at the southwesterly corner of the land granted to the Morris Canal and Banking Company, by an act of eighteen hundred and sixty-seven, and from thence running westerly and parallel with Grand street, in Jersey City, twenty-eight hundred feet ; thence northerly, at right angles with Grand street, five hundred feet ; thence westerly and parallel with Grand street, to the original high-water mark on the west side of Communipaw bay or cove ; thence returning to the place of beginning, and running easterly and parallel with Grand street, four hundred and forty feet along one of the southerly lines of the grants made to the Morris Canal and Banking Company, as aforesaid, to the centre line of Washington street extended southerly ; thence southerly along said centre line of Washington street extended southerly, which is one of the westerly lines of said grant to the Morris Canal and Banking Company, and at right angles with Grand street, five hundred and thirteen feet ; thence westerly and parallel with Grand street, about thirty-six hundred and fifty feet, more or less, to a point in line with the centre line of Jersey avenue, in Jersey City, if the same were extended southerly to said point ; thence southwesterly, in line with the said centre line of Jersey avenue, one hundred and sixty-five feet ; thence westerly and parallel with Grand street, in Jersey City, about five hundred feet, more or less, to the original high-water mark on the west side of the Communipaw bay or cove ; thence northeasterly along said original high-water mark at Communipaw bay or cove, to the mouth of Mill creek ; thence crossing said creek in a straight line and continuing northeasterly along said original high-water mark, until it intersects the end of the third course of this tract."

The grant was in fee simple, absolute and unqualified. For a portion of the consideration of the grant, the company gave to

the trustees for the support of public schools, the joint bond of the company and Asa Packer for $82,000, secured by a mortgage on the premises granted.

Interest being in arrear and unpaid, the trustees for the support of public schools, on the 26th day of April, 1875, filed a bill in the court of chancery for the foreclosure of the mortgage, and a decree for the foreclosure and sale of the mortgaged premises was obtained on the 22d day of October, 1875. Under this decree a sale was made on the 26th day of December, 1878. The sale was set aside on application to the chancellor, on the ground of surprise and irregularities in conducting the sale. *Trustees &c.* v. *N. J. West Line R. R. Co., 3 Stew. Eq. 494.*

Neither of the complainants was a party to the foreclosure suit, and in this condition of affairs they filed their bill, which gave rise to the decree appealed from.

The complainants' bill was filed on the 1st day of March, 1879. It claims title in the complainants, or some one of them, (1) as riparian owners ; (2) under the wharf act of 1851 ; (3) under the act of 1860, authorizing the extension of the Central railroad from Elizabeth to some point or points on New York bay ; (4) under the act of 1864, incorporating the American Dock and Improvement Company ; and also, title by estoppel arising from expenditures in improvements made by tacit consent and sufferance of the state. In addition to a claim of title derived from these sources, the bill sets up a right in the Central Railroad Company, under a covenant contained in a grant made by the riparian commissioners to the Central Railroad Company on the 12th of November, 1874. By that instrument the riparian commissioners granted the company several .tracts of land under water, within designated boundaries, for the consideration of $300,000, excepting out of the same, among other things, whatever premises and privileges may have been granted to the New Jersey West Line Railroad Company by the supplement to its charter, and the grant made by the riparian commissioners in pursuance thereof, describing the premises by metes and bounds, in full, the same as contained in the grant to the West Line company of March 19th, 1872. Then follows the covenant in

question, which is in these words : " As to the premises included in the said grant to the New Jersey West Line Railroad Company, it is agreed as follows : that in case the said state had not the right and power to vest the title in the said New Jersey West Line Railroad Company, which is, in and by the ninth section of the act approved February 29th, 1872, entitled, ' A supplement to an act entitled, An act to charter the Passaic Valley and Peapack Railroad Company, approved March 29th, 1865,' and in and by the aforesaid grant, in pursuance thereof, provided to be vested in that company, which right and power the said state claims to have had, and the Central Railroad Company of New Jersey claims that the said state did not have, then and in such case the said state shall, for the consideration of one dollar, and for no other or further consideration to be paid to the state therefor, release to the Central Railroad Company of New Jersey, free from any encumbrance thereon by mortgage given to the state, all its right, title and interest in the said premises mentioned and described in the said ninth section of said act, and in said grant to the said New Jersey West Line Railroad Company."

In this immediate connection the bill contained averments that the grant of the riparian commissioners to the West Line company was not within the purview of the ninth section of the act of 1872, as not being a grant of lands which " happened to come " within the location of the route of its railroad, because of the fraudulent character of such location. But the allegations on this head are foreign to the contents of the covenant in question. The condition expressed in the covenant, on which it is stipulated that the state shall release to the Central Railroad Company its right, title and interest in the premises, free from encumbrance, is dependent exclusively on the event of the state not having the right and power to vest the title in the West Line company, and not on the capacity of the West Line company to receive the grant. The grantee, having applied for and accepted the grant, could not, on the foreclosure of the consideration-money mortgage, set up the invalidity of the grant on the ground of its incapacity to receive it; nor does the cove-

nant in the grant to the Central Railroad Company contemplate a release of the rights of the state in the event simply of the grant to the West Line Company having been ineffective.

The bill adds an averment that the complainants are, and for a long time have been, in the peaceable possession of the premises, and have placed valuable and extensive improvements thereon.

The complainants' bill is an original bill. The state is not made a party to it; nor is there any prayer for a conveyance by the state pursuant to the covenant. The parties made defendants are the Trustees for the Support of Public Schools, the New Jersey West Line Railroad Company, and William Z. Larned, its receiver; Asa Packer, and the purchaser at the sheriff's sale, which has been set aside; and sundry mortgage and judgment creditors of the West Line company. John Taylor Johnston is also made a defendant, but his interest is with the complainants as trustee of a title which he holds for their benefit. The prayer of the bill is, that the lands and premises comprised within the so-called West Line grant may be declared, by decree, to be free from the cloud or encumbrance of the trustees' mortgage—that the title of the West Line company and of the trustees be decreed to be invalid—that the trustees be restrained from proceeding to sell the mortgaged premises, and that peaceable possession thereof by the complainants may be preserved; and for an injunction to restrain the sale of the mortgaged premises and the disturbance of the complainants' possession thereof.

Upon filing the bill, the chancellor allowed a rule to show cause why an injunction should not issue, in accordance with the prayer of the bill, and enjoined all proceedings on the execution, which had been issued on the decree, until further order should be made. Answers were filed by the trustees, and by the executors of Asa Packer, in denial of the complainants' right to relief. Upon the bill, and these answers, and the affidavits annexed to the bill and answers, the argument of the rule to show cause was had. The chancellor discharged the rule, vacated the interim restraining order, and denied the injunction prayed for

in the bill. From this order of the chancellor the complainants appealed.

I assume that the bill is adapted to obtain relief under the act entitled, " An act to compel the determination of claims to real estate in certain cases, and to quiet the title to the same," (*P. L. of 1870 p. 20, Rev. 1189*) ; for it was so considered by the chancellor, in his opinion. Independent of the covenant contained in the grant by the riparian commissioners to the Central Railroad Company, of November 12th, 1874 (which will presently be considered), the bill was designed to put the respective titles of the complainants, and of the West Line company, in a train for judicial determination. To a bill of such a scope, only, the state is not a necessary or proper party, for the state had parted with its entire title to the premises in dispute, by its grant to the West Line company, in 1872. It will also be observed that the order appealed from was one simply dissolving an interim injunction, and denying an injunction to stay a sale by the trustees under their foreclosure decree until the question of title should be determined. The complainants' bill was not dismissed, and the subject-matter of the litigation between the rival claimants to ownership of the property remains in the court of chancery, still undisposed of.

On this presentation of the case the sole topic for discussion is whether the trustees, in the situation of their foreclosure suit when this bill was filed, should, under the circumstances, be stayed from proceeding to a sale under their decree until a determination of the disputed title may be obtained. Except so far as shall be needful to decide the issue raised by the appeal, none of the interesting and important questions discussed so thoroughly by counsel will be adjudged or considered.

The trustees for the support of public schools are a board constituted for the administration of so much of the public revenue as is appropriated for the maintenance of public schools. It consists of the governor, the president of the senate, the speaker of the house, the attorney-general, the secretary of state, and the comptroller, for the time being. These public officials are constituted trustees of the fund for the support of public schools

arising from appropriations made for that purpose, and it is pro-
vided that they should be known by the name, style and title of
" The Trustees for the Support of Public Schools." They are
required to hold the public stocks and moneys appropriated by
the state for the support of public schools, in trust—the interest
and dividends arising therefrom to be applied by them, or a
majority of them, for the support of public schools, as prescribed
by the legislature from time to time, and for no other use or
purpose whatsoever. The investment of the fund is directed to
be made by the treasurer of the state under their direction, and
in the name of "The Trustees for the Support of Public
Schools." *P. L. of 1867 p. 360, Rev. 1081.* How far this
public body is amenable to suits was given a prominent place in
the discussion of counsel.

By the common law, no suit or action can be maintained
against the sovereign; the remedy is by petition of right. *2
Dan. Ch. Prac. 131; In re Baron de Bode, 2 Phil. 85.* But if
the attorney-general, as the representative of the crown, files an
information for the collection of crown revenues, he may be pro-
ceeded against by cross-bill for discovery and relief in aid of the
defence. *Deare v. Attorney-General, 1 Y. & C. Exch. 197.*
A foreign government cannot be sued in an English court; but
if it files a bill in an equity court for the enforcement of a right,
in such a suit the defendant may file a cross-bill for discovery
touching the matters for which he is sued, and for relief by way
of defence. *King of Spain v. Hullet, 1 Cl. & Fin. 333; Prio-
leau v. United States, L. R. (2 Eq. Cas.) 659; United States v.
Wagner, L. R. (2 Ch. App.) 582; Republic of Liberia v. Roye,
L. R. (1 App. Cas.) 139.* In certain cases where the interests of
the crown are incidentally concerned, the attorney-general may be
made a defendant to a bill in equity. In a suit between private
individuals to subject goods of a debtor who had been outlawed
to the payment of his debts, the attorney-general is a necessary
party; and if he be omitted, a demurrer will lie or the cause be
directed to stand over until he can be made a party. ———
v. *Bromley, 2 P. Wms. 269; Balch v. Wastall, 1 Id. 445.* In
*Stokes v. Holden, 1 Keen 145,* a bill was filed to recover a legacy;

the legatee had been convicted of felony; the attorney-general was made a party to the bill for the purpose of having the question decided whether upon the conviction the legacy did not pass to the crown by forfeiture. In *Dolder* v. *Bank of England, 10 Ves. 352,* the court refused to order dividends of stock purchased by the old government of Switzerland to be paid into court on the application of the new government, until the attorney-general was made a party, in view of a possible claim that the property passed to the crown as property derelict. In *Barclay* v. *Russell, 3 Ves. 424,* the controversy was over bank stock purchased by the government of Maryland before the American war; and, as appears on page 435 of the report of the case, the attorney-general was made a defendant and filed an answer. In *Baker* v. *Sutton, 1 Keen 224,* the attorney-general was made a party defendant to a bill filed to determine the validity of a charitable bequest. In all cases of charitable bequests, except where the bequest is to an officer of an established institution, the attorney-general is a necessary party to the bill, because the king, as *parens patriœ,* superintends all such charities and acts by the attorney-general, who is his proper officer in this respect. *Wellbeloved* v. *Jones, 1 Sim. & Stu. 40.* When the attorney-general, as an officer of the crown, is made a defendant, the bill, instead of praying process against him, prays that he may answer it upon being attended with a copy. *Story's Eq. Pl. § 44, note.*

Exemption from liability to be sued is the personal privilege of the sovereign; and if there be any officer of the government who is its representative with respect to the particular matter of the suit, he may be made a party to the suit, though the litigation concerns the public revenues. Practical illustrations of the application of this principle are common. In *State on the prosecution of the M. &. E. R. R. Co.* v. *Yard,* a suit was prosecuted against the commissioner of railroad taxation, an officer of the state, to restrain the collection of taxes assessed, and a decision was had by the supreme court of the United States that the assessment was invalid as against the prosecutor. *8 Vr. 228; 95 U. S. 104.*

The property in the fund set apart for the support of the

public schools is by law vested exclusively in the trustees to hold
on the trusts declared by the statute.    They are made custodians
of the fund, free, by constitutional provision, from even the
control of the legislature, except in the designation of the mode
of application to the support of public schools.    The invest-
ments of it are required to be in the name of "The Trustees
for the Support of the Public Schools."    Mortgages are taken
by their statutory title, and suits are prosecuted in that title for
the foreclosure of such mortgages.    For the purposes of the
administration of the fund of which they are made custodians,
and of the rights and remedies upon or against the securities in
which it is invested, the trustees are constituted the representa-
tives of the state.    Suits brought in the name of the trustees for
the foreclosure of mortgages are subject to the same defences by
answer or cross-bill as like suits by other mortgagees.    In a suit
such as the complainants have brought, a mortgagee of the owner
of the adverse title is a proper but not a necessary party.
Though the complainants may not be able, as against the trus-
tees, to present some of their grounds for relief, for the reason
that the trustees are not the proper parties to litigate them, the
trustees were properly made parties to this bill, and the relief
prayed may, if the grounds of it are otherwise sufficient, be
decreed against them.

The complainants seek the relief prayed for on two grounds:

*First.* The complainants rely on the covenant contained in the
grant made by the riparian commissioners to the Central Rail-
road Company.    The bill construes this covenant as an agree-
ment by the state to release the premises, to discharge the mort-
gage in question, and that it would not dispose of the title to the
premises by foreclosure or otherwise until it should be deter-
mined whether said title is valid as against the title of the Cen-
tral Railroad Company and those holding under them.    The
covenant is executory in terms and legal effect, and can only be
executed by a bill for a specific performance.    To such a bill the
state is a necessary party, and the trustees are not its representa-
tives in such a litigation.    In the next place, the covenant, if
the riparian commissioners were competent to make it, is inop-

erative and void as against the trustees' mortgage. By the constitution, " The fund for the support of free schools, and all money, stock and other property which may hereafter be appropriated for that purpose, or received into the treasury under the provision of any law heretofore passed, to augment the said fund, shall be securely invested, and remain a perpetual fund; and the income thereof, except so much as it may be judged expedient to apply to an increase of the capital, shall be annually appropriated to the support of public schools for the equal benefit of all the people of the state; and it shall not be competent for the legislature to borrow, appropriate or use the said fund or any part thereof for any other purpose, under any pretence whatever." *Art. IV.* § 7 ¶ 6. By an act passed on the 6th of April, 1871, entitled " An act to increase the school fund of the state," it was enacted that " all moneys hereafter received from the sales and rentals of the land under water belonging to the state shall be paid over to the trustees of the school fund, and appropriated for the support of free public schools, and shall be held by them in trust for that purpose, and shall be invested by the treasurer of the state under their direction in the same manner as the funds now held by them are invested; the same to constitute a part of the permanent school fund of the state, and the interest thereof to be applied to the support of public schools in the mode which now is or hereafter may be directed by law, and to no other use or purpose whatever." *P. L. of 1871 p. 98; Rev. p. 1081* § 67. By the ninth section of the act of 1872, under which the West Line grant was made, it was provided that the consideration of the grant should be paid by the company to the trustees of the school fund. Instead of receiving the consideration-money in cash, the trustees, for part of it, took a bond secured by this mortgage. The mortgage was executed, delivered and accepted by the trustees. The appropriation of the money secured by it was consummated, and it became a part of the perpetual school fund, within the meaning of the constitutional provision, and is protected by it. The legislature could not borrow, appropriate or use it for any other purpose than that for which it was set apart.

The mortgage was made in 1872; the grant to the Central Railroad Company was not made until 1874. The riparian commissioners had no power in 1874 to release or discharge a mortgage which before that time was an investment of part of the school fund. The legislature itself could not impair the security or discharge the mortgage except by passing an equivalent into the treasury for the benefit of the school fund. The title of the trustees, and of any purchaser at the sale of the mortgaged premises, may fail because of its inherent infirmity, but it cannot be impaired by a covenant with respect to the mortgaged premises, made by the riparian commissioners after the mortgage was executed and delivered.

*Second.* The other ground for relief is a claim of title in the complainants anterior to the grant to the West Line and to the mortgage of the trustees. If the title claimed by the complainants is clothed with the qualities and circumstances set forth in the bill, a sale in the foreclosure suit will not affect it. The complainants were not parties to the foreclosure suit and would not be concluded by the record; the purchaser at the foreclosure sale, though not a purchaser *pendente lite* with respect to the suit, would take his title with notice actual or constructive of the complainants' rights, and may be made a party to this suit for the purpose of litigating the title of the West Line company under its grant. If the complainants are entitled to restrain a sale under the trustees' foreclosure suit, it must be in virtue of some collateral equity which would justify such a measure of relief.

Before discussing this subject, it will be appropriate to consider for a moment, the claim put forth by the complainants' counsel, on the argument, for relief, under the answer of Larned, the receiver of the West Line company. This answer appears in the record sent up to this court, but was not before the chancellor on the hearing on which the order appealed from was made. It was not filed until the 9th of February, 1880. Larned, in his answer, affirms the validity of the title of the West Line company, but charges that it would be inequitable to dispose of the title by foreclosure, or otherwise, until its validity as against the claim of title by the complainants should be

determined, suggesting an equity in the mortgagor to have the foreclosure sale made upon an unclouded title. Aside from the fact that this answer was not before the chancellor when he made his order, it cannot avail the complainants on this appeal. If a mortgagor be entitled to have a sale under foreclosure proceedings delayed, until it may be made under circumstances advantageous to his interests, he should seek the indulgence in the foreclosure suit. In the next place, the complications which may have cast a cloud upon the mortgagor's title, arose before this mortgage was made. The mortgagor took its title from the state, with full knowledge of the situation of the premises granted. A mere defect in the title conveyed would have afforded no defence in the foreclosure suit, though the mortgage had been given directly for the purchase-money. *O'Brien* v. *Hulfish, 7 C. E. Gr. 471.* The covenant in the grant by the riparian commissioners, in 1874, to the Central Railroad Company, could not impair or affect the mortgagor's title, if title passed under the grant of 1872. If the covenant was made inconsiderately, and tends to impair the salable value of the mortgaged premises, it was an act for which the mortgagees are in nowise responsible. A mortgagor who mortgages an embarrassed title, or whose title has subsequently become clouded, cannot, in the absence of fraud, have the foreclosure proceedings held back on account of an apprehension that the mortgaged premises will not bring full value at a foreclosure sale. His remedy is by redemption.

In searching for an equity to entitle the complainants to an injunction to stay a sale until the validity of the contested title is settled, it must be borne in mind that the titles of the contestants, respectively, are legal titles. Even the rights of the complainants, claimed in the bill, as derived by estoppel, must be considered as a legal title—a title acquired by a riparian owner by reclamation. It can have no other foundation as against the state. Independent of the statute, a court of equity has no jurisdiction over the subject-matter of the dispute. The statute confers a jurisdiction of this character to settle the title to lands only where the complainant is in peaceable posses-

17

sion, and no suit be pending to enforce or test the validity of the adverse title, claim or encumbrance. *Rev. p. 1189.* I do not propose to discuss the question whether the bill was properly filed against the West Line company under this statute. Such a discussion is not necessary to the subject under review— whether the chancellor should have enjoined the mortgagees from a sale under the decree of foreclosure.

The decree was regularly obtained in the orderly prosecution of proceedings for foreclosure. The stay of execution and sale under the decree is sought by parties who were not parties to the foreclosure suit, and against whose claim of title a sale will be destitute of all legal force. A court of equity will ordinarily not interfere to enjoin a sale of lands under an execution against one person, the title to which is claimed by another, for the manifest reason that the sale will not prejudice the rights of the latter, and the question of title is properly triable in a court of law. *Freeman* v. *Elmendorf, 3 Hal. Ch. 475 ; S. C. on appeal, Id. 655.* To warrant resort to the restraining power of the court, the case must present some recognized ground for equitable relief—fraud, or irreparable injury.

Mr. High, speaking on this subject, says : "While the cases on this subject are far from reconcilable, the clear weight of authority is in favor of the proposition that, in the absence of fraud or gross injustice and irremediable injury, courts of equity will not entertain jurisdiction in restraint of judicial sales under executions against third persons having no title to the property sold." *High on Inj.* § *266.* Another principle which enters into the consideration of the matter presented by this appeal is, that courts interfere with great reluctance with the collection of the public revenues. *Jersey City* v. *Lembeck, 4 Stew. Eq. 465,* is an illustrative precedent: The city had laid an assessment on the complainant's lands, which, by the city charter, was an encumbrance ; the assessment was invalid ; no suit was pending in which the validity of the encumbrance could be tested. The complainant filed a bill under the statute against the city to settle the title to the land and determine the validity of the encumbrance. This court denied relief, on the ground that the

complainant might have had relief by a writ of *certiorari*, which he had lost by his own laches. To justify resort to a court of equity to stay the collection of public revenues, the party must make a case strictly within the bounds of equity jurisdiction— an injury otherwise not remediable; and he must seek and prosecute his remedy with promptitude.

The trustees' mortgage is an investment of a fund, the interest of which the statute and the constitution contemplate shall be applied annually to the support of public schools. The amount due on the mortgage when the decree was signed, by the accumulation of interest unpaid, had reached the sum of $99,345.80.

On the 8th of January, 1870, an information was filed in the court of chancery by the attorney-general in the name of the state, against the Central Railroad Company, complaining of encroachments upon lands of the state which included the parcel afterwards granted to the West Line company. In this suit the title of the complainants might have been presented for determination. On the 24th of December, 1870, the attorney-general filed a petition supplemental to the information, asking an injunction, on which a rule to show cause was granted, and a temporary injunction was allowed restraining the Central Railroad Company from making improvements on the premises. This injunction order was continued by consent until a final hearing should be had. The act authorizing the grant to the West Line company was passed February 29th, 1872. By this act the trustees were authorized to require payment in cash of the consideration of any grant that might be made under its provisions. In lieu of cash they consented to accept for part of the consideration the mortgage in question as an investment for the benefit of the school fund. The West Line grant, although it bears date on the 19th of March, 1872, was not in fact executed and delivered until about the 21st of May, 1872. On the 25th of May, 1872, formal notice of the grant was served on the officers of the Central Railroad Company by the West Line Company; and on the 27th of February, 1873, the Central Railroad company filed its answer to the information of the attorney-general, in which, while denying the power of the

state to make the West Line grant, it set up the grant in bar of the right of the state to proceed with the information.

The foreclosure bill was filed April 26th, 1875, and a final decree taken October 22d, 1875. On the 10th of January, 1876, Mr. Johnston, to whom the complainants had made conveyance of the premises for the purpose of giving the federal courts jurisdiction over this controversy, filed in the circuit court of the United States for the district of New Jersey a bill of the same import as the bill in this case, asking substantially the same relief and an injunction staying a sale under the foreclosure decree, which injunction, not having been renewed at the next succeeding term, expired by force of the rules and practice of the federal courts, and was, on the 30th of November, 1878, discharged on motion of the attorney-general. The complainants' bill was not filed until the 1st of March, 1879.

By reason of delays consequent on this litigation, down to this period, the trustees have not been able to realize the interest on this fund, which by law should have been applied annually to the support of the public schools. The mortgaged premises will now bring at a sale the amount due on the decree, although, with interest and costs, it nearly equals the price for which the premises were sold to the mortgagor. There is no reason to suspect that the trustees are permitting the decree to be used in the interest of either of the principals in the litigation, or are pressing the sale from any other than the laudable purpose of securing the money for the public treasury, and enabling them to receive and apply the interest which may accumulate upon it to the use to which it is devoted. These public officers, in the execution of the trust confided to them, have a well-fortified claim that they shall be permitted to administer this fund and apply it as the law prescribes, and that investments of it should not be subjected to the delay and vicissitudes of a litigation that promises to be uncommonly protracted, with a possible result that at the end the morgaged premises may be inadequate to satisfy the decree and accumulated interest, or their mortgage title be entirely defeated.

The bond taken by the chancellor on setting aside the former

sale is no answer to the urgency of the trustees that the property shall be again sold. Ample as the sureties on the bond are, it is no equivalent for a vendible mortgage estate which, in the market, will bring the money. For one contingency the bond is no security whatever. Its condition is, that on a resale the premises shall bring the amount then due on the execution for debt, interest and costs, together with the lawful expenses. The condition does not apply in the event of the complainants' success in this suit in obtaining the injunction prayed for, perpetually enjoining a sale. It leaves the hazard of that result upon the mortgagees. Nor does the bond fulfill the purposes for which the collection of the mortgage-money is urged. The trustees are entitled to have the money invested so that the interest may be available for use annually in the support of the public schools.

The surety on the trustees' bond has equities, too, that cannot be lightly regarded. His estate has no indemnity for his liability on the bond except the vendible value of the mortgaged premises, and the obligation of a bankrupt corporation in the hands of a receiver. Now the indemnity from the first source is ample. A sale of the mortgaged premises will pay the debt. His executors have filed an answer praying a sale of the mortgaged premises for the purpose of securing a release of the estate of the deceased from liability on the bond. They submit to the court that, if the title asserted by the complainants should turn out to be superior to that granted by the state to the West Line company, the complainants have no equity as against the estate of their decedent to hinder, delay or prevent a sale of the mortgaged premises. The force of this prayer seems to me to be undeniable. It presents considerations of pre-eminent weight on an application to a court of equity for a discretionary writ, which is never allowed except on a clear preponderance of equity on the side of the applicant.

Against the equities of the trustees and the surety on the bond, the complainants oppose equities derived from two sources. First, they say that if the premises are sold in the foreclosure suit, and are purchased by other parties, the Central Railroad

Company will lose the improvements made upon them, in case the West Line grant proves to be valid. Inasmuch as the title of the Central Railroad Company might have been tested and determined in the information suit of 1870, which was pending when the West Line grant was made, this contention has little weight as against the mortgagees and the surety on the bond. The complainants may dispel the risk of an issue unfavorable to their title by redemption of the mortgage, or by purchasing at the sale. Having delayed, if not evaded, a trial of title in the information suit, the complainants, after the mortgagor has become insolvent and the foreclosure suit has been prosecuted to a final decree, have no equity to subject the surety to delay, and the consequent risk that the mortgaged premises may finally be inadequate to satisfy the mortgage debt, or to cast upon the mortgagees the risk of an unfavorable termination of this litigation.

The other ground of the complainants for equitable relief is based on the covenant contained in the grant of the riparian commissioners to the Central Railroad Company in 1874. I have shown that this covenant is legally inoperative against the trustees' mortgage. The defendants' counsel push this matter further. They contend that the covenant is invalid as against the state, for want of power in the riparian commissioners to bind the state by covenants not annexed to the lands actually granted. A discussion of this problem at this time would lead beyond the bounds proposed by this opinion, and is not necessary to the question proposed to be decided; for the complainants' counsel place their argument on this head on matters collateral to the grant, and independent of the validity of the covenant. They say that for the grant the Central Railroad Company paid into the state treasury the sum of $300,000, which went into and became part of the school fund. Upon this fact they contend that the trustees are equitably estopped from repudiating the covenant and selling away the premises, so that the execution of the covenant by a grant of the premises in compliance with it would be made impracticable.

The equitable doctrine invoked is that a party who accepts a

benefit must take it *cum onere*.   He cannot have the advantage of one part of a transaction which enures to his benefit and repudiate other parts which are advantageous to the other party. If he voluntarily accepts a benefit from the transaction with knowledge of its import, he ratifies it as a whole, and he cannot repudiate its obligations without first restoring the consideration he has received.   He must elect between entire repudiation, with a restoration of the benefits received under it, and complete adoption of the proceeding with all its obligations.   The equity of a party who relies on an equitable estoppel to give validity to an inefficient contract is not to have his contract made binding, but to put his adversary to an election between performance of the contract and repudiation of it upon equitable terms.

The doctrine of equitable estoppel presupposes that the person against whom it is set up has the volition to accept or reject the proffered benefit, and power to restore the consideration if received.   The endeavor to apply it to this case springs from a misconception of the relations between the trustees for the support of public schools and the riparian commissioners, and of the powers and duties of the trustees in the management of the school fund.   The trustees have no control over the state's lands under water.   Whatever control the state has given over these lands it has entrusted to the riparian commissioners, an independent legislative board.   The trustees have no authority to decide what lands under water shall or shall not be sold, or to fix the price or dictate the terms and conditions on which sales shall be made, nor power to rescind contracts of sale made by the riparian commissioners, which they may deem prejudicial to the school fund.   They have not even the capacity to determine from what sources the revenues for the support of public schools shall be derived—no choice as to what moneys shall or shall not become part of the school fund.   These are matters exclusively within legislative discretion.   The powers and duties of the trustees in relation to the school fund are purely executive and ministerial—to invest the fund and appropriate its income annually to the support of public schools.   They could not lawfully abstract from the school fund the money needed, on the

principles of equitable estoppel, to effect a rescission of the grant to the Central Railroad Company, on the hypothesis that the grant was injurious to the interests of public schools. When moneys accumulated from legislative grants become part of the school fund, the legislature is prohibited by constitutional inhibition from withdrawing them or impairing investments of them, directly or indirectly. The constitutional protection of the school fund would be of little avail if another legislative board, by contracts it might make, could produce the same result by an equitable estoppel, against which the trustees, in whose custody the school fund is lodged, cannot relieve themselves.

The people of this state have shown the utmost solicitude for the integrity of this fund. Considerations of public policy require that the courts should give to the fund the full measure of protection the constitution has placed over it, and should, as far as consistent with the rules of law, resist every effort to impair the investments of the fund, or embarrass the trustees in the administration of it in the manner prescribed by law. It is undeniable that a stay of the collection of this mortgage until this litigation shall be ended—depriving the trustees of the yearly interest, which should be applied annually to the support of schools—would prevent the trustees performing a public duty obligatory upon them with respect to this part of the fund. The Central Railroad Company accepted its covenant with notice of the trustees' mortgage, and of the nature of the trust on which the investment was made—knowing that the covenant was not legally binding upon the trustees, and chargeable with knowledge that it was the duty of the trustees to collect the mortgage whenever the investment failed to bring in interest for use annually for the support of public schools. Having accepted the covenant with knowledge of the condition of affairs, the company has no equity to interpose the inconvenience and embarrassments that might arise to it from that source between the trustees and the duties these public officers are required to perform. It is said that the state, recognizing its obligation under the covenant made by the riparian commissioners, will make good to the school fund the money secured by this mortgage; but, until that

be actually done, I do not see how the anticipation that it may be done can be made to square with the constitutional provision that the legislature cannot borrow or appropriate the fund to any use other than the purposes for which it is held by the trustees.

But if it should be conceded that, out of this covenant and the circumstances surrounding it, an equity might arise in favor of the complainants as against the mortgagees to have a sale of the mortgaged premises postponed until the title to the premises should be settled, these facts can be of no avail against the personal representatives of the surety on the bond. His obligation was entered into before the covenant was made. Neither he nor the corporation he was interested in, has derived any advantage from it. So far as their interests are concerned, the covenant was designed in hostility to the title of the West Line company, under its grant, to give the complainants a supposed better standpoint from which to controvert its validity.

The covenant will create an equity in the complainants to be allowed to redeem the mortgage and be subrogated to the right of the mortgagees in the decree, so far as to give protection against a sale under it pending this litigation—subject, however, to the equities of the personal representatives of the surety on the bond. The covenant, if it be valid and binding on the state, may serve to confer on the covenantee a standing on which to controvert the power of the state to make a grant of land under water to any other person than the adjacent riparian owner. It may also, in that event, lay the foundation of a claim to re-imbursement by the state of the outlay incurred in the redemption of the mortgage, on the happening of the contingency on which the covenant was made to depend. But it cannot be made available to the complainants against the indisputable equity of the mortgagees and of the personal representatives of the surety on the bond, to have the mortgage and the liability of the surety taken out of this litigation and disposed of in the condition of affairs as they were when the mortgage was given and the obligation of the surety was incurred.

The decree of the chancellor denying the injunction should be affirmed.

*Decree unanimously affirmed.*